**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| INTELSAT USA SALES CORP., | : | | |
| | : | | |
| Plaintiff, Counterdefendant | : | Civil Action No.: | 10-2095 (RC) |
| | : | | |
| v. | : | Re Document No.: | 12 |
| | : | | |
| JUCH-TECH, INC., | : | | |
| | : | | |
| Defendant, Counterclaimant | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART THE PLAINTIFF'S MOTION TO DISMISS THE
DEFENDANT'S COUNTERCLAIM**

## I. INTRODUCTION

At the heart of this lawsuit is a contract dispute between two satellite communications

companies.  Now before the court is the plaintiff's motion to dismiss the defendant's

counterclaim.  The court grants the motion in part and denies the motion in part.

## II. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Intelsat USA Sales Corp. ("Intelsat") and Juch-Tech, Inc. ("Juch-Tech") are companies

that operate in the satellite communications industry.  In 2005, the parties entered into a

contractual agreement titled the Non-Exclusive Service Agreement ("NESA").  Counterclaim ¶

23.  Under this agreement, Juch-Tech leased satellite capacity from Intelsat on two satellites so

that Juch-Tech could provide communications services to its customers.  *Id.*

In early 2009, the parties entered into an additional agreement, under which Juch-Tech

agreed to lease additional satellite capacity from Intelsat.  *Id.* ¶ 24.  Juch-Tech claims that it was

induced to enter this additional agreement via several promises: in particular, Intelsat promised

to assign certain consumer contracts to Juch-Tech, to provide certain sales leads, and to abstain

from competing with Juch-Tech under certain circumstances.  These promises were memorialized in a contract called the Transition Agreement.  *See generally id.*, Ex. A.

Intelsat claims that it performed all of its contractual obligations but that Juch-Tech refused to pay for the services rendered.  *See* Compl. ¶¶ 6–7.  Juch-Tech claims that Intelsat did not provide services at the level mandated by the NESA.  Counterclaim ¶ 34.  Juch-Tech also claims that Intelsat failed to correct technical problems with its satellites, which made it harder for Juch-Tech to serve its clients or to obtain new customers.  *Id.* ¶ 27.  In addition, Juch-Tech claims that Intelsat violated the Transition Agreement by failing to assign customer contracts, failing to provide sales leads, and by breaching its agreement not to compete.  *Id.*  Finally, Juch-Tech claims that Intelsat interfered with its business by spreading false rumors that Juch-Tech was on the verge of bankruptcy.  *Id.*

Both parties agree that their contractual relationship was terminated in October 2010.  Compl. ¶ 8; Counterclaim ¶ 8.  Intelsat brought suit for breach of contract and quantum meruit, and Juch-Tech brought a host of counterclaims.  *See* Docket No. 10.  The counterclaim's many counts oscillate between New York and Canadian law: Breach of Contract under New York law (Count I); Fraud under New York law (Count II); Fraudulent Misrepresentation under Canadian law (Count III); Tortious Interference with Contractual Relations under New York law (Count IV); Tortious Interference with Contractual Relations under Canadian law (Count V); Tortious Interference with Business Relations under New York law (Count VI); Tortious Interference with Commercial Matters under Canadian law (Count VII); Defamation under New York law (Count IX);[1] Defamation under Canadian Law (Count X); Violation of the Canadian Trademark

---

[1] There is no Count VIII.

Act (Count XI); and Declaratory Judgment (Count XII).  For the reasons explained below, the court will grant in part and deny in part Intelsat's motion to dismiss.

## III. ANALYSIS

### A. Legal Standard for a Motion to Dismiss Under Rule 12(b)(6)

All that the Federal Rules of Civil Procedure require of a complaint is that it contain a "short and plain statement of the claim" in order to give the defendants fair notice of what the claim is and the grounds upon which it rests. FED. R. CIV. P. 8(a)(2), *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  A court considering such a motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to plead all elements of his *prima facie* case in the complaint. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Id*.  A court need not accept a plaintiff's legal conclusions as true, *id.*, nor must the court presume the veracity of legal conclusions that are couched as factual allegations.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**B. Legal Standard for Pleading a Fraud Claim Under Rule 9(b)**

Federal Rule of Civil Procedure 9(b) requires that a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "The rule serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude. . . . And because "fraud" encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981). Although Rule 9(b) imposes a heightened pleading standard, it should be read in conjunction with Rule 8's command that a complaint need only include a "short and plain statement" of the claim. *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). Read together, Rules 8 and 9(b) require that the pleader state the time, place, and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud, as well as the individuals allegedly involved in the fraud. *Id.* (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)).

**C. Juch-Tech's Contract Claim (Count I)**

Juch-Tech alleges that Intelsat committed a breach of contract when it violated the NESA and the Transition Agreement. Counterclaim ¶¶ 33–40. Intelsat argues that Juch-Tech's counterclaim does not contain enough factual allegations to constitute a plausible claim to relief and should be dismissed under Rule 12(b)(6). Pl.'s Mot. at 12.

As a preliminary matter, both parties agree that Count I should proceed under New York law due to a choice-of-law provision in the contract. Pl.'s Mot. at 9; Def.'s Opp'n at 8. To establish a breach of contract under New York law, a plaintiff must allege: (1) the existence of the contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach

4

of its obligations pursuant to the contract; and (4) damages resulting from that breach. *Elisa Dreier Reporting Corp. v. Global NAPS Networks, Inc.*, 2011 WL 1630922, at *4 (N.Y. App. Div. Apr. 26, 2011).

Juch-Tech alleges that Intelsat breached several contractual agreements. The first is contained within the NESA. The NESA provided that "Intelsat would supply Juch-Tech with satellite transponder services at a guaranteed minimum service level." Counterclaim ¶ 34. Juch-Tech alleges that Intelsat breached its obligations under the NESA "by failing to provide Juch-Tech the services identified . . . at a service level required by the NESA and failing to conduct the transition of services properly." *Id.* ¶ 38. Similarly, Juch-Tech alleges that Intelsat "refused to correct . . . several technical problems with its satellite transponders that materially impaired, or precluded, Juch-Tech from serving its existing clients or obtaining new customers." *Id.* ¶ 26.

Second, Juch-Tech claims that Intelsat breached the Transition Agreement. *Id.* ¶ 39. Under the Transition Agreement, Intelsat promised to assign Juch-Tech several customer contracts. *Id.* Juch-Tech alleges that Intelsat failed to assign contracts for at least two customers: Millenium Arrow and Bentley-Walker. *Id.* ¶¶ 48–49, *id.*, Ex. A ("Transition Agreement") (promising to assign those contracts). Intelsat also promised that it would provide Intelsat with certain sales leads. Transition Agreement § 2(iii) ("Intelsat will provide sales leads to Juch-Tech when possible."). Juch-Tech alleges that Intelsat failed to abide by that promise as well. Counterclaim ¶ 39. Intelsat also agreed not to compete with Juch-Tech under certain circumstances. *See* Transition Agreement § 2(iii) ("Intelsat will not directly offer a competing Linkstar Hub Service in North America which uses a Linkstar hub on any Intelsat Satellite segment/service for the duration of this agreement."). Juch-Tech alleges a violation of this

promise as well.  *See* Counterclaim ¶ 52 ("Intelsat also misrepresented its intention not to directly compete against Juch-Tech in North America.").

Intelsat takes issue with the last two arguments, arguing that the missing sales leads are not specified, and that it did not violate its promise to abstain from competing.  Pl.'s Mot. at 14. Even so, Juch-Tech's counterclaim contains enough factual matter to proceed to discovery. Juch-Tech's factual allegations fit neatly within the confines of a *prima facie* contract claim: Juch-Tech alleges (1) the existence of a contract (the NESA and the Transition Agreement); (2) Juch-Tech's performance, *see* Counterclaim ¶ 37 ("Until such time as Intelsat fraudulently induced Juch-Tech to enter into Service Order No. 22165 and the Transition Agreement, Juch-Tech performed pursuant to the terms of the NESA and Transition Agreement"); (3) the other party's breach (Intelsat's refusal to provide services, failure to fix technical problems, and failure to assign customer contracts); and, (4) damages, *see id.* ¶ 40 ("Juch-Tech has paid for services it did not receive, suffered the loss of customers and potential customers, and has therefore been damaged by Intelsat's breaches of the NESA, Service Order No. 22165, and the Transition Agreement.").  In sum, the court concludes that Juch-Tech has put forth enough factual matter to support a plausible claim to relief.  *Iqbal*, 556 U.S. at 678.

### 1. The NESA's Limited Liability Clause

Intelsat argues that the NESA contains a limited liability clause that prevents Juch-Tech from recovering any money damages.  Pl.'s Mot. at 13–15.  And a court "may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief."  *Dyncorp v. GTE Corp.*, 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002); *see Deutsche Lufthansa A v. Boeing Co.*, 2007 WL 403301, at *2–3 (S.D.N.Y. Feb. 2, 2007) (construing a contract's limited liability clause on a motion to dismiss).  Juch-Tech argues

that the clause is unenforceable because it was procured by fraud.  Def.'s Opp'n at 9–10.  The

clause states as follows:

> 9.2 With the exception of claims for death or personal injury due to Intelsat's negligence, for
> which there is limitation imposed, it is expressly agreed that Intelsat's sole obligation and the
> Customer's exclusive remedy for any direct loss whatsoever, arising out of or relating to this
> Agreement is Interruption Credits, and the Customer agrees that these are a genuine pre
> assessment of loss and damage.
>
> 9.3 In no event shall either party be liable for any indirect, special punitive, incidental or
> consequential damages whatsoever arising out of or under this Agreement, whether under contract,
> warranty, tort or otherwise, including, without limitation, loss of revenue or profits, regardless of
> the foreseeability of such damages.

Compl., Ex. A.[2]

New York law generally endorses the use of limited liability clauses because they

"represent[] the parties' agreement on the allocation of the risk of economic loss in the event that

the contemplated transaction is not fully executed . . . ."  *Metro. Life Ins. Co. v. Noble Lowndes

Int'l Inc.*, 84 N.Y.2d 430, 436 (1994).  Thus, a limited liability clause is enforceable even if the

parties "may later regret their assumption of the risks of non-performance," and courts will

generally "let them lie on the bed they made."  *Id.* (quoting 5 CORBIN, CORBIN ON CONTRACTS §

1068 (1964)).  This rule is not ironclad, however.  A limited liability clause may be

unenforceable if "the misconduct for which it would grant immunity smacks of intentional

wrongdoing."  *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983).  "This can

be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting

in bad faith.  Or, when, as in gross negligence, it betokens a reckless indifference to the rights of

others, it may be implicit."  *Id.*  But this is not an easy standard to meet: courts require "nothing

---

[2]     Although the counterclaim does not provide the court with a copy of the NESA, it is incorporated
        by reference.  *See* Counterclaim at 3, n.3.  Thus, the court may consider its provisions on a
        motion to dismiss.  *See In re XM Satellite Radio Holdings Secs. Litig.*, 479 F. Supp. 2d 165, 174
        (D.D.C. 2007) ("In deciding a motion to dismiss, the Court must typically confine its analysis "to
        facts stated on the face of the complaint, in documents appended to the complaint or incorporated
        into the complaint by reference, and to matters of which judicial notice may be taken.") (citation
        omitted).

short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme

culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an

extensive pattern of wanton acts." *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.

Supp. 2d 436, 454 (S.D.N.Y. 2003).

Juch-Tech alleges that Intelsat acted with such bad faith as to render the limited liability

clause unenforceable, and the court agrees.  Juch-Tech's counterclaim alleges intentional fraud,

defamation, and a number of other misdeeds.  If true, these acts certainly "smack[] of intentional

wrongdoing" such that they can pierce a limited liability clause.  *Kalisch–Jarcho, Inc.*, 58

N.Y.2d at 385; *Turkish v. Kasenetz*, 27 F.3d 23, 27–28 (2d Cir. 1994) ("It is well settled that

parties cannot use contractual limitation of liability clauses to shield themselves from liability for

their own fraudulent conduct.").  In addition, Juch-Tech appears to argue that there was fraud in

the procurement—that is to say, Juch-Tech alleges that it never would have entered the contract

but for Intelsat's fraudulent conduct.  If proven true, the contract would be independently

unenforceable.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC*, 798

N.Y.S.2d 14, 16 (1st App. Div. 2005) ("A contract induced by fraud, however, is subject to

rescission, rendering it unenforceable by the culpable party.").  Although Juch-Tech will

ultimately face a "high burden to *prove* that [the defendant's] conduct falls within this narrow

exception to the general enforceability of limitation of remedy clauses," *Tomoka Re Holdings,*

*Inc. v. Loughlin*, 2004 WL 1118178, at *5 (S.D.N.Y. May 19, 2004), at this stage Juch-Tech's

allegations must be taken at face value.  Accordingly, the court rejects Intelsat's argument.

### 2. The Transition Agreement's Limited Liability Clause

Intelsat also argues that the Transition Agreement contains a similar limitation of liability

clause.  Pl.'s Mot. at 14.  For the same reasons listed above, this clause does not yet warrant

dismissal of Juch-Tech's contract claim.  Thus, the court denies Intelsat's motion to dismiss Count I.

### D. Choice of Law Analysis for Juch-Tech's Remaining Claims

Juch-Tech brings several claims under the common law of New York and Canada. Intelsat argues that these claims should be analyzed under D.C. law.  Both parties urge the court to undertake a choice-of-law analysis, but in doing so, they overlook a crucial step.  The court is only required to engage in a choice-of-law analysis if there is an actual conflict between the laws of the competing jurisdictions.  *Am. Petroleum Inst. v. Technomedia Intern., Inc.*, 699 F. Supp. 2d 258, 264 n.3 (D.D.C. 2010) ("Before embarking on any choice of law analysis, the Court 'must first determine if there is a conflict between the laws of the relevant jurisdictions.  Only if such a conflict exists must the court then determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the 'more substantial interest' in the resolution of the issues.'" (quoting *Young Women's Christian Ass'n of the Nat'l Capital Area, Inc. v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002))); *Eli Lilly & Co. v. Home Ins. Co.*, 653 F. Supp. 1, 4–5 (D.D.C. 1984) (concluding that federal courts entertaining a diversity action will not engage in choice of law exercise when the laws of the interested states do not conflict).  If no conflict exists, the law of the forum—here, D.C. law—applies.  *Phelps v. Stomber*, 2012 WL 3276969, at *35 (D.D.C. Aug. 13, 2012).  Here, neither party has identified any conflict between the laws of these jurisdictions.  Accordingly, the court will consider Juch-Tech's claims under D.C. law.

### E. Juch-Tech's Fraud Claims (Counts II–III)

In Counts II and III, Juch-Tech claims that Intelsat committed three acts that constituted fraud.  First, Juch-Tech alleges that Intelsat falsely promised to transfer the Millennium Arrow contract.  Counterclaim ¶ 48.  Second, Juch-Tech alleges that Intelsat knowingly lied about the profitability of the Bentley-Walker contract.  *Id.* ¶ 49.  Third, Juch-Tech appears to allege that

Intelsat committed fraud by reneging on its promise not to compete for Juch-Tech's customers. *Id.* ¶¶ 51–52.

To state a claim for fraud, a plaintiff must allege the following elements: "(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *In re Estate of McKinney*, 953 A.2d 336, 342 (D.C. 2008). In commercial contracts negotiated at arm's length, the plaintiffs must also plead (6) reliance that is objectively reasonable. *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997); *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992).

At the outset, the court will dismiss the portion of Juch-Tech's fraud claim that is predicated on Intelsat's agreement not to compete. Juch-Tech does not point to any communications other than the promise contained within the Transition Agreement. And other than a vague allegation that this promise was broken, there are few details provided. In particular, there are not enough facts for the court to infer that Intelsat's promise was known to be false when it was made. Nor are there enough facts for the court to infer that the promise was made with an intent to deceive. Finally, Intelsat argues that the contract does not contain the promise that Juch-Tech says it does, and Juch-Tech has not adequately responded to that point. Accordingly, the court will dismiss this portion of Count II for failure to plead fraud with particularity under Rule 9(b).

Juch-Tech's other claims are plead with more particularity. Juch-Tech alleges that Intelsat personnel emailed Juch-Tech's CEO to indicate that several profitable contracts would be assigned to Juch-Tech under the Transition Agreement. Counterclaim ¶¶ 43–44. Intelsat thus conveyed that "Juch-Tech would earn a profit from the revenues generated from the assigned

customers." *Id.* ¶ 44.  Juch-Tech alleges that these representations induced Juch-Tech to enter

into the Transition Agreement, under which Intelsat agreed to assign Juch-Tech six specific

customer contracts:  Easynet, Atlasco (QKON), DCC Satellite Networks, Mattel, Bentley-

Walker, and Millennium Arrow.  *Id.* ¶ 46; *see id.*, Ex. A.  These promises were false, Juch-Tech

alleges, because (1) Intelsat promised to transfer a contract (Millennium Arrow) that did not

exist; and (2) Intelsat promised that certain contracts were profitable, when in fact one customer

(Bentley-Walker) had already stopped paying its bills.

Intelsat raises a bevy of arguments in support of its motion to dismiss.  First, Intelsat

argues that the claims are too muddled to meet Rule 9(b)'s pleading standard.  *See* Pl.'s Reply at

10 ("The 'misrepresentation' that Juch-Tech attempts to muddle together, out of whole cloth, is

that Intelsat was guaranteeing to Juch-Tech that these customers would pay their bills to Juch-

Tech promptly and forever.  There was of course no such representation made by Intelsat, nor do

the Counterclaims contain any allegation that there was, despite Juch-Tech's Opposition's

strained attempts at misdirecting the Court from examining the Counterclaims' actual

allegations.").  But Intelsat needlessly distorts Juch-Tech's allegations.  Juch-Tech's does not

allege—nor does it need to allege—that Intelsat "guaranteed" certain payments "forever."

Rather, the court may reasonably infer as follows:  Intelsat promised that it would transfer certain

valuable contracts to Juch-Tech in exchange for Juch-Tech's purchase of additional satellite

capacity.  Moreover, Intelsat allegedly promised that those contracts were profitable and, at the

time of the promise, were generating a specified revenue stream.  Thus, Intelsat's promise is

allegedly false because (1) Intelsat had no contract with Millennium Arrow to transfer; and (2)

Bentley-Walker's contract would not be profitable and was not generating the promised revenue

stream because that customer was not paying its bills.

In the court's view, Juch-Tech's allegations meet Rule 9(b)'s heightened pleading standard: Juch-Tech identifies the time and place of the false misrepresentations, (emails from Colleen Parent, Michael J. Mendelson, and Alicia Schwarcz to Juch-Tech's CEO dated January 5, 2009 and March 19, 2009, *see* Counterclaim ¶ 43); the content of the representations (that if Juch-Tech agreed to enter into the Transition Agreement and Service Order No. 22165, Intelsat would assign six profitable contracts to Juch-Tech, *see* Transition Agreement, Ex. A); its falsity (that Intelsat had a contractual relationship with Millennium Arrow, and that it had a profitable relationship with Bentley-Walker, *see* Counterclaim ¶ 48); an intent to deceive (which can be inferred from the surrounding facts), what was given up as a consequence of the fraud (an expanded contract for more satellite space at additional expense, *see id.*); and reasonable reliance (Juch-Tech having no reason to doubt Intelsat's representations).

Second, Intelsat argues that a fraud claim cannot be predicated on a "prediction of future events." *See* Pl.'s Reply at 19.  In essence, Intelsat appears to argue that its promise to assign the Millennium Arrow and Bentley-Walker contracts was not a statement of existing fact, but was instead "an opinion or a prediction of future events." *Id.* at 20.  And it is true that "a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence." *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977).  On the other hand, "[w]hen a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud." *Id.*  Here, there is no hazy "prophecy or prediction" of future occurrences.  Instead, Intelsat promised to assign several profitable contracts while knowing that—in some circumstances, at least—there were no profitable contracts to assign.  Accordingly, Intelsat's argument must be rejected.

12

Third, Intelsat argues that it committed a mere "omission" of "material facts," which does not constitute fraud.  Pl.'s Mot. at 21 ("However, it is well established under District of Columbia law that a fraud claim can be based on an omission of material facts only if there is a duty to speak.").  Intelsat is halfway correct:  "It is well established under District of Columbia law that 'mere silence does not constitute fraud unless there is a duty to speak.'"  *Cadet v. Draper & Goldberg, PLLC*, 2007 WL 2893418, at *6 (D.D.C. Sept. 28, 2007) (quoting *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C.1948)).  But the other half of Intelsat's argument is meritless.  The fraud alleged does not stem from Intelsat's innocent failure to advert Juch-Tech to certain facts.  Rather, it stems from Intelsat's affirmative representation.  In the context of an affirmative statement, Intelsat's "omission of material facts" is the very essence of a fraud claim: Intelsat made a promise while "omitting" that the promise was false.

Fourth, Intelsat argues that Juch-Tech was required to plead that its reliance on Intelsat's representations was "objectively reasonable."  Pl.'s Mot. at 21.  This is true for fraud claims that arise between commercial entities that negotiate contracts at arm's length.  *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992).  But Intelsat does not indicate why it would be objectively unreasonable to rely on its representations.  Accordingly, the court rejects this argument as well.

Fifth, Intelsat also argues that Juch-Tech "cannot show that the alleged misrepresentations were material, another essential element in a fraud action."  Pl.'s Mot. at 22.  Under D.C. law, a false representation is material if it is shown that the correct facts would have had a bearing on the action of a decision-maker.  *See Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 374 (D.D.C. 2008).  But Intelsat puts forward no reason to suggest—and the court has no independent reason to believe—that the existence of the Millennium Arrow contract or the

profitability of the Bentley-Walker contract were somehow immaterial to the promises contained in the Transition Agreement.  To the contrary, as alleged by Juch-Tech, the assignment of the profitable contracts was the quid-pro-quo for Juch-Tech agreeing to obtain additional satellite space that, it asserts, it did not otherwise require.  The profitability of those contracts is material.

Sixth, Intelsat argues that the Transition Agreement contains an integration clause that bars Juch-Tech's fraud claim, Pl.'s Mot. at 21.  This argument requires some unpacking.  When deciding contract claims, courts ordinarily focus on the contract's written language instead of earlier promises.  *See 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 210 (D.C. 1984) (explaining the parol evidence rule, which "promote[s] stability of transactions by preventing disgruntled parties from avoiding obligations by alleging oral understandings that conflict with their written agreements when those agreements were reduced to writing in order to forestall such contentions"); 11 WILLISTON ON CONTRACTS § 33:1 (4th ed.) ("The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement. . . . [I]t seeks to achieve the related goals of ensuring that the contracting parties, whether as a result of miscommunication, poor memory, fraud, or perjury, will not vary the terms of their written undertakings, thereby reducing the potential for litigation.").  This rule applies with even greater force if the contract contains a clause—usually referred to as a "merger clause" or an "integration clause"—indicating that the contract represents a complete and final expression of the parties' wishes.  *See Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 928 & n.17 (D.C. 1992).

14

As with every rule, there is an exception.  For instance, a contract that was procured by fraud has no legal effect.  *See Wash. Inv. Partners of Del., LLC v. Secs. House, K.S.C.C.*, 28 A.3d 566, 576 (D.C. 2011).  And to prove that a contract was the product of fraud, a party is not confined to the four corners of the contract.  *McMahon v. Anderson, Hibey & Blair*, 728 A.2d 656, 658 n.5 (D.C. 1999) (if alleged to be the product of fraud, "the written contract is not absolutely sacrosanct against external evidence").  This is true even if the contract contains a merger clause.  *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 127 (D.C. 1992); RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981).

Thus, courts may face something of a paradox: even if a contract explicitly disavows all earlier promises, a party may wriggle out of the contract by claiming fraud and invoking earlier promises.  These rules are necessarily in tension, and the case law suggests an uneasy truce. *Compare One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) ("Were we to permit plaintiffs' use of the defendants' prior representations (and defendants' nondisclosure of negotiations inconsistent with those representations) to defeat the clear words and purpose of the [contract's] integration clause, 'contracts would not be worth the paper on which they are written.'" (quoting *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C. 1968))) (Bader Ginsburg, J.) *with Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995) (limiting *One-O-One v. Caruso*'s holding and noting that a merger clause cannot bar *all* fraud claims, for doing so "would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate").

Unfortunately, none of these rules have any bearing here.  The aforementioned rules govern for contract claims.  *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 931–33 (D.C. 1992); *Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564 (D.C

2000). They do not apply if a party brings a separate claim—sounding in tort—for fraud. *In re Estate of McKenney*, 953 A.2d 336, 341 (D.C. 2008). "Traditionally, a person who was induced to enter into a contract by a misrepresentation has several common law causes of action, including fraud in the inducement sounding in tort *and* rescission sounding in contract." *Id.* (emphasis added). "The distinction between these two may be important because each action requires a different level of proof and allows for different remedies." *Id.* "By suing in tort, the defrauded party 'does not seek to undo the fraudulent transaction but claims sufficient compensation to make his position as good as it would have been had he not entered into the transaction at all.'" *United Secs. Corp. v. Franklin*, 180 A.2d 505, 510 (D.C. App. 1962) (citing 5 WILLISTON ON CONTRACTS § 4264)).

Count II of Juch-Tech's counterclaim alleges that Intelsat committed fraud when it made certain statements before signing the Transition Agreement. Intelsat argues the court must ignore these statements, for they find no mention in the contract.[3] But in the context of a fraud claim, the court is not restricted to the contract's language—even if a merger clause is present. *Drake v. McNair*, 993 A.2d at 624; *see Sabo v. Delman*, 143 N.E.2d 906, 161 (N.Y. 1957) ("In short, a contractual promise made with the undisclosed intention not to perform it constitutes fraud and, despite the so-called merger clause, the plaintiff is free to prove that he was induced by false and fraudulent misrepresentations to . . . execute the agreements."). The court notes that the merger clause may ultimately make it harder for Juch-Tech to prove its claim. *See Drake v. McNair*, 993 A.2d 607 (D.C. 2010) (noting that a settlement agreement's merger clause did not bar an independent fraud claim, but that the plaintiff lacked sufficient evidence to show fraud); *In re U.S. Office Products Co. Secs. Litig.*, 251 F. Supp. 2d 77, 101–02 (D.D.C. 2003)

---

[3]    The court disagrees with Intelsat's premise: the Transition Agreement explicitly contains some of these promises.

(concluding that plaintiffs could not prove fraud in the face of a merger clause because parties will normally put all "material" statements in the contract).  But at this juncture, the court cannot gauge the sufficiency of Juch-Tech's evidence.  Because "an integration clause does not provide a blanket exemption" to fraud claims, *Drake v. McNair*, 993 A.2d at 624, the court will deny Intelsat's motion to dismiss Count II.

### F. Juch-Tech's Tortious Interference Claims (Counts IV–VII)

Juch-Tech brings claims for tortious interference with contractual relations under New York law (Count IV) and Canadian law (Count V).  Juch-Tech also brings claims for tortious interference with business relations under New York law (Count VI) and tortious interference with commercial matters under Canadian law (Count VII).  Juch-Tech alleges that Intelsat tortiously interfered with its business by spreading false rumors about Juch-Tech's financial health, making it harder for Juch-Tech to serve its customers.  Counterclaim ¶ 65.  Juch-Tech also alleges that Intelsat competed for Juch-Tech's business in violation of the Transition Agreement.  *Id.*  In doing so, Juch-Tech alleges that Intelsat induced Juch-Tech's customers to breach their contracts with Juch-Tech, or, at the least, "materially impaired or made impossible Juch-Tech's ability to serve its existing clients."  Counterclaim ¶¶ 65, 75.  Finally, Juch-Tech alleges that Intelsat interfered with its business by degrading its services, thereby making it more difficult for Juch-Tech to serve its customers.  *Id.* ¶ 65.  Intelsat argues that these claims must be dismissed for failure to state a plausible claim under Rule 12(b)(6).  Pl.'s Mot. at 25.

Under District of Columbia law, there are two types of tortious interference claims: tortious interference with contract and tortious interference with prospective advantageous business transaction.  *See Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 56 (D.D.C. 2010).  For the reasons explained below, the court will allow Juch-Tech's claims to proceed to discovery.

### 1. Tortious Interference with Contract

To assert a tortious interference with a contract claim, a plaintiff must allege: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach. *Casco Marina Dev., LLC. v. D.C. Redev. Land Agency*, 834 A.2d 77, 83 (D.C. 2003) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000).

Intelsat argues that Juch-Tech failed to identify any actual contractual breach that resulted from Intelsat's behavior. Thus, Intelsat argues that the claim of tortious interference with contract must fail because "[a] breach of contract is an essential element of the tort." Pl.'s Mot. at 26. In *Casco Marina Dev., LLC v. D.C. Redevelopment Land Agency*, the D.C. Court of Appeals held that an actual breach is not a necessary element of the *prima facie* case. 834 A.2d 77, 84 (D.C. 2003) ("[W]hile we have articulated the third element of tortious interference as procurement of breach, . . . a 'breach' as such is not required, but merely a failure of performance, whether by the terms of the contract in question or not."); *see Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289–90 (D.C. 1989). But in a later case, a different panel of that same court concluded that "[u]nlike in some jurisdictions, courts in the District of Columbia have held that 'a breach of contract is an essential element' of the tort." *Murray v. Wells Fargo*, 953 A.2d 308, 325–26 (D.C. 2008) (citing *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (1995)). Thus, the D.C. Court of Appeals' decision in *Murray* conflicts with *Casco Marina* and *Sorrels*, its earlier opinions.

This court finds *Murray*'s reasoning unpersuasive. The panel in *Murray* cited the D.C. Circuit's opinion in *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (1995) for the proposition that "'a breach of contract is an essential element' of the tort." 953 A.2d at 326. But *Edmonson* drew no such conclusion. To the contrary, the Circuit

acknowledged that the law was unclear and explicitly chose not to decide that question.

*Edmonson*, 48 F.3d at 1266 (declining supplemental jurisdiction over state-law claims of tortious

interference because "[n]eedless decisions of state law should be avoided," and because "D.C.

courts are better equipped to resolve the unsettled legal questions in this case.").  Moreover, the

D.C. Court of Appeals is not bound by the D.C. Circuit's interpretations of state law—though the

Circuit's decisions may be persuasive.  *See Johnson v. Fankell*, 520 U.S. 911, 916 (1997)

("Neither this Court nor any other federal tribunal has any authority to place a construction on a

state statute different from the one rendered by the highest court of the State.").  Following the

weight of authority, therefore, the court concludes that Juch-Tech was not required to allege a

specific breach of contract as a part of its *prima facie* case.  *Casco Marina*, 834 A.2d at 84.

Accordingly, the court will deny Intelsat's motion to dismiss Counts IV and V.

### 2. Tortious Interference with Business Relations

Juch-Tech alleges that Intelsat tortiously interfered with several prospective

advantageous business transactions by spreading false rumors about Juch-Tech's financial

health, by competing with Juch-Tech in derogation of the Transition Agreement, and by

degrading the service Intelsat provided to Juch-Tech.  Counterclaim ¶¶ 65, 75.  Intelsat puts forth

several reasons why these claims should be dismissed.

To establish a claim for tortious interference with prospective advantageous business

transaction under D.C. law, a plaintiff must show: (1) the existence of a valid business

relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the

interferer, (3) intentional interference inducing or causing a breach or termination of the

relationship or expectancy, and (4) resultant damage.  *See Bennett Enters. v. Domino's Pizza,*

*Inc.*, 45 F.3d 493, 498 (D.C. Cir. 1995).

19

Intelsat first argues that the facts alleged do not support an inference of intent.  Pl.'s Mot. at 27.  But the requisite level of intent may be inferred if the tortious interference involves "fraud, misrepresentation, or disparagement."  *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988).  Thus, the court can infer the necessary level intent from Juch-Tech's allegations of fraud, disparagement, and defamation—especially given that intent need only be alleged generally.  FED. R. CIV. P. 9(b).

Second, Intelsat argues that Juch-Tech never identified the customers that purportedly breached the contracts.  Pl.'s Mot. at 27.  But a contractual breach is not an element of this tort, and Intelsat recognizes that Juch-Tech identifies several companies—DCC Satellite Networks, Atlasco (QKON), Galaxy Broadband, and Link Serve—which were allegedly induced to terminate their agreements and customer relationships with Juch-Tech.  Counterclaim, ¶¶ 50–51.

Third, Intelsat argues that no individual component of Juch-Tech's allegations, if taken in isolation, could support a tortious interference claim.  *See* Pl.'s Mot. at 28 (arguing that a poorly alleged defamation claim cannot constitute tortious interference); *id.* at 29 (arguing that a breach of contract claim cannot form the basis for a tortious interference claim); *id.* (arguing that a separate putative breach of the Transition Agreement could not form a basis for Juch-Tech's claim).  But Intelsat misses the larger picture: Juch-Tech alleges that Intelsat reneged on its agreement, made it harder for Juch-Tech to do business, and spread lies to Juch-Tech's customers.  Accordingly, these allegations fit the contours of a *prima facie* claim for tortious interference with prospective advantageous business transaction.  To wit, Juch-Tech alleges (1) the existence of a valid business relationship or expectancy with DCC Satellite Networks, Atlasco (QKON), Galaxy Broadband, and Link Serve, *see* Counterclaim, ¶¶ 50–51; (2) knowledge of the relationship or expectancy on the part of the interferer; *id.*; (3) intentional

20

interference in the form of Intelsat's degradation of its satellite services, spreading of false

rumors, and unlawful competition; and (4) resultant damage, *id.* ¶ 55.  Thus, Juch-Tech plausibly

alleges its *prima facie* case.  *See Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d at 498.

Finally, Intelsat argues Juch-Tech's claim to relief is foreclosed by the limited liability

clauses in the NESA and Transition Agreement.  Pl.'s Mot. at 30.  But for the same reasons

discussed earlier, these clauses may be unenforceable.  Accordingly, the court will dismiss the

tortious interference with contractual relations claims (Counts IV and V) for failure to allege an

actual breach, but allow the tortious interference with prospective advantageous business

transaction claims (Count VI and VII) to proceed to discovery.

### G. Juch-Tech's Defamation Claims (Counts IX–X)

In Counts IX and X, Juch-Tech alleges that Intelsat personnel committed defamation by

spreading false rumors that Juch-Tech was on the verge of bankruptcy.  Counterclaim ¶¶ 27, 87.

Intelsat moves to dismiss, arguing that Juch-Tech does not allege enough factual details to

sustain a plausible claim to relief.  Pl.'s Mot. at 28.

Under D.C. law, a plaintiff claiming defamation must show: (1) that the defendant made

a false and defamatory statement concerning the plaintiff; (2) that the defendant published the

statement without privilege to a third party; (3) that the defendant's fault in publishing the

statement amounted to at least negligence; and (4) either that the statement was actionable as a

matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007); *Blodgett v. Univ. Club*,

930 A.2d 210, 222 (D.C. 2007).  "A statement is 'defamatory' if it tends to injure the plaintiff in

his trade, profession or community standing, or lower him in the estimation of the community."

*Clawson v. St. Louis Dispatch, LLC*, 906 A.2d 308, 313 (D.C. 2006) (citation omitted).

There is no heightened pleading standard for defamation claims in the District of Columbia.  *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009).  Instead, D.C. courts focus on whether the factual allegations in the complaint are sufficient to permit the opposing party to form responsive pleadings.  *Id.*; *see Williams v. District of Columbia*, 9 A.3d 484, 491 (D.C. 2010); *Oparaugo v. Watts*, 884 A.2d 63, 76–77 (D.C. 2005); *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n.2 (D.C. Cir. 1999).

Here, Juch-Tech identifies the individual who made the defamatory statement: Mark Rasmussen, Vice President of Sales for North America Network Services.  Counterclaim ¶ 87.  Juch-Tech also alleges the content of the statements: namely, that Juch-Tech was on the verge of bankruptcy or that Juch-Tech would be shortly out of business.  *Id.*  Juch-Tech also identifies the recipients of the statement: DCC Satellite Networks, Atlasco (QKON), Galaxy Broadband, and Link Serve, all of whom were actual or potential Juch-Tech customers.  *Id.*  Juch-Tech argues that these rumors were false, and that they were defamatory because their content was damaging to Juch-Tech's business relationships.  *See Clawson*, 906 A.2d at 313.

Intelsat argues that Juch-Tech's claim must be dismissed because the counterclaim does not list the "the time, place, content, speaker, and listener of the alleged defamatory matter."  *See, e.g.*, *Franklin v. Pepco Holdings, Inc. (PHI)*, 2012 WL 2870266, at *7 (D.D.C. July 13, 2012).  But this is assessment is not entirely accurate.  To explain, the "time, place, content, speaker, and listener" requirement finds its genesis in *Ridgewells Caterers v. Nelson*, 688 F. Supp. 760, 763 (D.D.C. 1988).  There, the court noted that the plaintiff "does not identify which of [defendant's] employees are involved, to whom the alleged defamatory statements were communicated, the substance of the alleged statements, or any indication of their time, place, context or frequency."  *Id.*  Later cases took this language out of context, holding that each of

these details—time, place, content, speaker, and listener—were rigid pleading requirements. *See, e.g.*, *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011); *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996).

In doing so, these cases impose an inaccurate gloss on the law—one that has been rejected by the D.C. Court of Appeals and the D.C. Circuit. *See Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (refusing to adopt a heightened standard that would require the plaintiff to "plead the time, place, content, speaker and listener of the allegedly defamatory matter"); *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d at 215 n.2 ("The [defendants] cite *Caudle v. Thomason*, 942 F. Supp. 635, 638–39 (D.D.C. 1996), for the proposition that heightened pleading requirements apply in defamation cases.  In fact, as with any pleading, [the plaintiff's] complaint must allege the elements of the cause of action; the Federal Rules of Civil Procedure impose no special pleading requirements for defamation . . . .").  Thus, the court rejects the plaintiff's proposed pleading standard.

To be clear: a plaintiff that failed to specify *any* of these factors would face dismissal under *Iqbal* and *Twombly*.  But Juch-Tech has alleged the speaker, recipient, subject matter, and defamatory nature of the statements; these allegations are sufficient to nudge its claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.  By no means do Juch-Tech's factual allegations consist of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Id.* (citing *Twombly*, 550 U.S. at 569).  Rather, Juch-Tech has alleged enough factual matter to give Intelsat fair notice of the claim and to allow Intelsat to craft a responsive pleading. *See Solers, Inc. v. Doe*, 977 A.2d at 948.  And for defamation claims, "[w]hat is called for at the motion to dismiss stage is simply 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Williams*

*v. District of Columbia*, 9 A. 484, 493 (D.C. 2010) (quotation omitted).  Accordingly, the court

denies Intelsat's motion to dismiss Juch-Tech's defamation claims.

### H. Juch-Tech's Canadian Trademark Claim (Count XI)

In Count XI, Juch-Tech alleges that Intelsat violated section 7(a) of Canada's Trademark

Act, which states:  "No person shall . . .  make a false or misleading statement tending to

discredit the business, wares or services of a competitor."  Trade-marks Act, R.S.C. 1985, c. T-

13 § 7(a); *see In re Houbigant Inc.*, 914 F. Supp. 964, 991 (S.D.N.Y. 1995).  Juch-Tech claims

that Intelsat violated this provision when it "made false and misleading statements that Juch-

Tech was in imminent financial peril in order to cause Juch-Tech customers to terminate their

relationships with Juch-Tech and become Intelsat customers, or to dissuade potential customers

from contracting with Juch-Tech."  Counterclaim ¶ 95.  Intelsat claims that this court lacks

subject-matter jurisdiction because Canada's trademark law has "no extraterritorial effect."

Under the "territoriality" principle, each country's laws apply within that country's

boundaries.  *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1316 (D.C.

Cir. 1980) (describing the territoriality principle and its exceptions).  Under the related

"territorial effects" doctrine, a state has jurisdiction over conduct occurring outside its territory

that has—or is intended to have—substantial effects within that state's territory.  *Id.*; *see also*

*Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909, 922 (D.C. Cir. 1984).  Thus, a

company that operates within the U.S. is subject to U.S. law—but an American company that

commits acts having a substantial effect abroad may be subject to the host country's laws.

Juch-Tech alleges that Intelsat violated Canadian law because of the impact Intelsat's

actions had in Canada.  Def.'s Mot. at 19 n.11 ("Juch-Tech is simply seeking to enforce its rights

under the Canadian trademark act for injuries it sustained *in Canada*").  The allegation in no way

requires the "extraterritorial" application of Canadian law, as Intelsat maintains.  It entails

nothing more than the notion that an American's actions can have a cross-border impact that violates a neighboring country's laws. *Laker Airways*, 731 F.2d at 922 ("It has long been settled law that a country can regulate conduct occurring outside its territory which causes harmful results within its territory."); *see also Strassheim v. Daily*, 221 U.S. 280, 284 (1911) (Holmes, J.) ("Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."). Thus, "[a] state has jurisdiction to prescribe law with respect to . . . conduct outside its territory that has or is intended to have substantial effect within its territory." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402; *see id.* cmt. d (noting that the effects principle includes "sending libelous publications across a boundary").

Contrary to Intelsat's suggestions, several courts have concluded that there is no principled reason to bar, in absolute fashion, claims brought under foreign law for lack of subject matter jurisdiction. *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 637 (S.D.N.Y. 2000) ("[A] copyright owner may sue an infringer in United States courts even though the only alleged infringement occurred in another country. Under the territoriality principle, the copyright law of the other country, and not United States copyright law, will govern the action in the United States." (quoting 3 PAUL GOLDSTEIN, COPYRIGHT § 16.2 (2000)); *see also Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 129–30 (D.D.C. 2011) (concluding that this court had subject-matter jurisdiction to hear foreign copyright claims for conduct committed abroad); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 258 (S.D.N.Y. 2000) ("[A]t this stage in the proceedings, there is no reason to believe that the Court would be foreclosed from applying foreign law to plaintiff's foreign infringement claims."); *Frink Am., Inc. v. Champion Road Mach., Ltd.*, 961 F.

Supp. 398, 404–05 (N.D.N.Y. 1997) (refusing to dismiss claim brought against U.S. corporation for violation of Canadian copyright law and stating that objections to the court's subject matter jurisdiction "are without merit").

Intelsat cites to *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956), for the proposition that it is not "the province of United States district courts to determine the validity of trademarks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with the administrative and judicial officers of the Dominion of Canada." *Id.* at 647. But *Vanity Fair* is distinguishable: first, that claim was not dismissed for lack of jurisdiction, but under the non-jurisdictional doctrine of *forum non conveniens*. *Id.* at 646. Second, that case challenged the validity of the underlying Canadian trademark, and in doing so asked the court to review the acts of Canadian government officials. *Id.* In contrast, it is not clear that this case would require the court to review any foreign official's acts. *See Rundquist v. Vapiano SE*, 798 F. Supp. 2d at 130 (distinguishing *Vanity Fair*); *Frink Am. Inc.*, 961 F. Supp. at 404 (concluding that the court had subject matter jurisdiction for claims under Canadian copyright law).

Juch-Tech's claim, though arising under Canadian law, appears analogous to the common-law tort of unfair competition. Under D.C. law, the common-law tort of unfair competition "is not defined in terms of specific elements, but by the description of various acts that would constitute the tort if they resulted in damage." *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 57 (D.D.C. 2001). These acts may include "defamation, disparagement of a competitor's goods or business methods," and "interference with access to the business." *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982). A party may state a plausible claim for unfair competition by alleging defamation and tortious interference with advantageous

business relations.  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 153 (D.D.C.

2011) (noting that allegations of interference with the plaintiff's business satisfied the pleading

requirements for the "fluid requirements of the tort for unfair competition"); *Bus. Equip. Ctr. v.

DeJure-Amsco, Corp.*, 465 F. Supp. 775, 788 (D.D.C. 1978) (concluding that the cause of action

for tortious interference with business relations is "virtually the same as that for unfair

competition").

Here, Juch-Tech invokes a provision of Canadian law which falls under the heading

"Unfair Competition and Prohibited Marks."  Trade-marks Act, R.S.C. 1985, c. T-13 § 7.  At the

heart of its claim, Juch-Tech alleges that Intelsat's "false and defamatory statements discredited

Juch-Tech's business and services."  Counterclaim ¶ 97.  These allegations could have easily

been brought as a claim for unfair competition under D.C. law.  Like the common law tort

claims, pursuant to a choice-of-law analysis, it seems likely that D.C. law would govern.  *Phelps

v. Stomber*, 2012 WL 3276969, at *35 (if there is no conflict between the competing jurisdiction,

the law of the forum state applies).  And, if construed under D.C. law, Juch-Tech's allegations

would survive a motion to dismiss.  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d at

15.  But the parties have not briefed whether statutory claims, like common law claims, are

subject to a choice-of-law analysis.  Regardless, because the claims are overlapping, the court

need not decide at this time whether Canadian law or D.C. law applies.  Either way, the factual

basis for Juch-Tech's claim will proceed to discovery.  Accordingly, the court will deny

Intelsat's motion to dismiss Count XI without prejudice at this time until further factual

development of where the harm, if any, has been suffered and pending additional briefing on the

Canadian law issue.

**I. Juch-Tech's Declaratory Judgment Claim (Count XII)**

A count for a declaratory judgment "is not cognizable as a separate cause of action, but is more properly included in the[ ] prayer for relief." *Walpin v. Corp. for Nat. & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010).  Thus, the court will dismiss Count XII and simply construe it as a portion of Juch-Tech's prayer for relief.  *See Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 45 (D.D.C. 1996).

**IV. CONCLUSION**

For the reasons explained above, the court grants in part and denies in part Intelsat's motion to dismiss.  An order consistent with this memorandum opinion is separately issued this 27th day of March, 2013.

RUDOLPH CONTRERAS
United States District Judge