# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| INTELSAT USA SALES CORP., | : | | |
| | : | | |
| Plaintiff and Counter-Defendant, | : | Civil Action No.: | 10-2095 (RC) |
| | : | | |
| v. | : | Re Document No.: | 37 |
| | : | | |
| JUCH-TECH, INC., | : | | |
| | : | | |
| Defendant and Counter-Claimant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART INTELSAT'S MOTION TO DISMISS

## I. INTRODUCTION

In this contract dispute between two satellite communications companies, the defendant and counter-claimant alleges breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement. The plaintiff and counter-defendant moves to dismiss all three claims. For the reasons set forth below, the Court will grant the motion in part and deny it in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and Counter-Defendant Intelsat USA Sales Corp. ("Intelsat") and Defendant and Counter-Claimant Juch-Tech, Inc. ("JTI") are companies that operate in the satellite communications industry. In 2005, the parties entered into a contractual agreement titled the Non-Exclusive Service Agreement, 1st Am. Compl. Ex. 1, ECF No. 3 ("NESA"), under which JTI leased satellite capacity from Intelsat on two satellites so that JTI could provide its customers with communications services. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 26, ECF No. 30.

In early 2009, the parties entered into an additional agreement, Am. Countercls. Ex. A, ECF No. 30-1 (the "Transition Agreement"), and a companion agreement, Service Order No. 22165, under which JTI agreed to lease additional satellite capacity from Intelsat in exchange for, among other things, Intelsat's sale of a Linkstar Hub (the "Atlanta Hub") and assignment of Intelsat's contracts with the customers who were using that satellite capacity at the time. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 27–28. JTI was to lease capacity on the IS-1R satellite, which was already in orbit at the time, and then transition to IS-14, a satellite that would become operational several months later. *See id.* ¶ 27.

According to the allegations contained in its amended counterclaims, JTI claims that it did not need the additional capacity for itself, but was induced to enter the Transition Agreement and Service Order No. 22165 as a result of certain representations about the value of the customer contracts that Intelsat would assign. *See id.* ¶ 28. JTI alleges that Intelsat, through its agents, represented that once customers on IS-1R were migrated to IS-14, there would be little capacity left on the IS-14 satellite. *See id.* ¶ 54. JTI also alleges that Intelsat provided JTI with a financial analysis of the contracts to be assigned under the Transition Agreement, showing that the revenues from the contracts would exceed the cost of JTI's lease, resulting in a profit for JTI. *See id.* ¶ 56.

But, JTI alleges, not everything was as it seemed. According to the allegations of JTI's amended counterclaims, Intelsat knew, but failed to disclose, that certain customers were not paying their bills and would not renew their contracts, others had been complaining about the poor service on the Atlanta Hub and IS-1R for some time, and still others were threatening to terminate their contracts due to poor service. *See id.* ¶ 59. Moreover, JTI alleges that, once the Transition Agreement was executed, Intelsat failed to conduct the transition from IS-1R to IS-14

in a manner that would minimize disruption of service, and failed to correct other technical problems that made it difficult for JTI to obtain customers and serve existing clients. *See id.* ¶¶ 33, 42.

JTI then fell behind on its payments to Intelsat. *See id.* ¶ 34. The companies entered a period of renegotiation between July and September of 2010, but JTI alleges that during that period Intelsat approached current and potential JTI customers in order to convince them to abandon JTI and sign on with Intelsat or another provider. *See id.* ¶ 35–36. JTI alleges that some of the statements Intelsat made to these clients about JTI were false or incomplete. *See id.* ¶ 47.

Both parties agree that their contractual relationship was terminated in October 2010. *See* 1st Am. Compl. ¶ 8; Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 8. Intelsat initiated this litigation against JTI, filing a complaint for breach of contract and unjust enrichment on the theory that Intelsat performed all of its contractual obligations but that JTI refused to pay for the services rendered. *See generally* 1st Am. Compl. JTI filed a counterclaim alleging eleven causes of action, ranging from breach of contract under New York law to unfair competition under Canadian trademark law. *See generally* Answer 1st Am. Compl. & Countercls., ECF No. 10. After the Court granted in part and denied in part Intelsat's motion to dismiss JTI's original counterclaims, *see generally Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101 (D.D.C. 2013) (ECF No. 22), JTI filed an amended counterclaim that included seven counts: (1) breach of contract under New York law; (2) breach of the implied covenant of good faith and fair dealing under New York law; (3) fraud in the inducement under D.C. law; (4) tortious interference with contractual relations under D.C. law; (5) tortious interference with business relations under D.C. law; (6) defamation under D.C. law; and (7) unfair competition

under the Canadian Trademark Act. *See generally* Am. Answer 1st Am. Compl. & Am. Countercls. By consent of the parties, Counts IV through VII have been dismissed. *See* Stipulation, ECF No. 42 (Counts VI and VII); Minute Order, Dec. 13, 2013 (Counts IV and V). Intelsat now moves to dismiss Counts I through III. *See generally* Intelsat's Mot. Dismiss Am. Countercls., ECF No. 37.

## III. LEGAL STANDARDS

### A. Failure to State a Claim

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations

omitted). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556

U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a

court presume the veracity of the legal conclusions that are couched as factual allegations. *See*

*Twombly*, 550 U.S. at 555.

### B. Fraud

Federal Rule of Civil Procedure 9(b) requires that, "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.

9(b). The complaint must therefore "state the time, place and content of the false

misrepresentations, the fact misrepresented and what was retained or given up as a consequence

of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). Rule 9(b), in

other words, "requires that the pleader provide the 'who, what, when, where, and how' with

respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253

(D.D.C. 2004) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

If a pleading fails to satisfy the heightened requirements of Rule 9(b), courts should

freely grant leave to amend. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)

(per curiam). Accordingly, courts "should reserve dismissal with prejudice for extreme

situations where the pleader has had the opportunity to cure any deficiencies but either has not or

cannot do so." *Anderson*, 221 F.R.D. at 253 (internal quotation marks omitted).

## IV. ANALYSIS

### A. Breach of Contract (Count I)

JTI's breach of contract claim contains four theories of breach, alleging that Intelsat (1) failed to provide JTI the services agreed to in Service Order No. 22165 in the manner required by the NESA; (2) failed to remedy service failures as required by the NESA; (3) failed to conduct the transition of services from IS-1R to IS-14 in the period required to mitigate disruption; and (4) failed to deliver the customers it undertook to assign to JTI or deliver those customer relationships in the condition promised. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 42–43, ECF No. 30. The first three theories are governed by the NESA; the fourth, by the Transition Agreement. *See id.*

Under New York law,[1] a breach of contract claim has four elements: "the existence of a contract, the plaintiff's performance pursuant to that contract, the defendants' breach of their obligations pursuant to the contract, and damages resulting from that breach . . . ." *Elisa Dreier Reporting Corp. v. Global NAPs Networks, Inc.*, 921 N.Y.S.2d 329, 333 (App. Div. 2011); *accord Goaltex Corp. v. Ass'n for the Blind & Visually Impaired*, 979 N.Y.S.2d 481, 486 (Sup. Ct. 2014) ("The essential elements of a cause of action in breach of contract are the existence of a contract, plaintiff's performance, defendant's failure to perform, and damages."). Intelsat challenges JTI's pleading of the third element, arguing that the Transition Agreement only required Intelsat to assign specifically identified contracts—which it did do—and not to deliver "customers" or "customer relationships" as JTI alleges. *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 8–9, ECF No. 37-1. Intelsat's brief does not expressly challenge the other

---

[1] The relevant agreements both contain choice-of-law provisions selecting New York law, *see* NESA § 16, ECF No. 3; Transition Agreement § 7(c), ECF No. 30-1, and the parties do not dispute the applicability of New York contract law here.

theories of breach in JTI's amended counterclaims, and instead simply "incorporates by reference" all arguments set forth in its motion to dismiss JTI's original counterclaims. *See id.* Because the instant motion relates to an amended pleading, containing different allegations, the Court finds that "incorporation by reference" of arguments that pre-date the pleading is insufficient to raise those questions fairly. Nonetheless, the Court will address the issue of the contracts' limited liability clauses, raised in Intelsat's original motion, for the sole purpose of clarifying the Court's earlier opinion in this case.

### 1. Assignment of Contracts

JTI alleges that "Intelsat breached its obligations under the Transition Agreement by failing to deliver the customers it undertook to assign to Juch-Tech and/or deliver those customer relationships in the condition represented, promised, and commercially reasonable." Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 43. This allegation requires some unpacking. As Intelsat correctly notes, it is unclear how a "customer" or "customer relationship" would even be assignable at law. *See* Intelsat's Reply Mem. Supp. Mot. Dismiss Am. Countercls. 3 n.2, ECF No. 41. Under the Transition Agreement, Intelsat was required to "assign to Juch-Tech those customer contracts outlined in Exhibit A . . . ." Transition Agreement ¶ 2(v), ECF No. 30-1.[2] Notably, JTI's counterclaims do not allege that Intelsat retained for itself any of the contracts that were listed in the exhibit. Instead, as explained in its briefing, JTI's theory is that Intelsat breached the Transition Agreement because the assigned contracts did not have the value JTI

---

[2] On a motion to dismiss, the Court considers facts alleged within the four corners of the complaint, documents attached as exhibits or incorporated by reference in the complaint, and documents upon which a plaintiff's complaint necessarily relies. *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citing *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), and *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009)). Thus, the Court considers the contracts themselves in connection with JTI's breach of contract claim.

expected.  *See* JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 5–9, ECF No. 39.  The Court is

thus presented with a matter of contract interpretation—whether Intelsat was obligated under the

Transition Agreement to deliver the listed contracts in any particular condition.  Under New

York law, contract interpretation is a question of law suitable for disposition on a motion to

dismiss.  *See, e.g.*, *PB Ams. Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 247 (S.D.N.Y. 2010).

"It is well settled that a contract is to be construed in accordance with the parties' intent,

which is generally discerned from the four corners of the document itself.  Consequently, 'a

written agreement that is complete, clear and unambiguous on its face must be enforced

according to the plain meaning of its terms[.]'"  *MHR Capital Partners LP v. Presstek, Inc.*, 912

N.E.2d 43, 47 (N.Y. 2009) (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170

(N.Y. 2002)).  Moreover, "where a contract contains a merger clause, a court is obliged 'to

require full application of the parol evidence rule in order to bar the introduction of extrinsic

evidence to vary or contradict the terms of the writing[.]'"  *Schron v. Troutman Sanders LLP*,

986 N.E.2d 430, 433–34 (N.Y. 2013) (quoting *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 679

N.E.2d 624, 627 (N.Y. 1997)).  Thus, particularly in the face of an integrated contract, a party

may rely on external evidence or promises only to resolve an ambiguity in the contract or to

show that the contract was fraudulently induced.  *See Bristol Inv. Fund, Inc. v. Carnegie Int'l

Corp.*, 310 F. Supp. 2d 556, 564 (S.D.N.Y. 2003).

The Transition Agreement is not ambiguous as to the contracts JTI was to receive.  The

contract states that Intelsat was obligated to assign "those customer contracts outlined in Exhibit

A" to JTI.  Transition Agreement ¶ 2(v).  The language is clear that the consideration consisted

of contracts and not "customer relationships."  The exhibit, in turn, lists eleven contracts by

customer name and contract number. *See id.* Ex. A. Thus, there is also no ambiguity as to the condition of the assigned contracts, because the contracts are specifically identified.

The express warranties contained in the Transition Agreement make no mention of the condition of the contracts, *see id.* ¶ 6, and JTI cites no doctrinal implied warranties at common law that would apply to the transaction at issue here.[3] Indeed, JTI repeatedly states that its use of the term "commercially reasonable" in its counterclaim does not make reference to a term of art. *See, e.g.*, JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 5 n.2. Furthermore, the contract contains an integration clause, providing that the written agreement "constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof . . . ." Transition Agreement ¶ 7(j). To impose a warranty based solely on JTI's external expectations would violate the parol evidence rule, which "precludes extrinsic proof to add to or vary [the] terms" of an integrated contract. *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 679 N.E.2d 624, 627 (N.Y. 1997). JTI does not allege that Intelsat retained for itself possession of any of the contracts listed in Exhibit A, and it has not presented a valid basis for imposing additional conditions not present in the Transition Agreement itself.[4] The Court will therefore grant Intelsat's motion to dismiss JTI's breach of contract claim as to JTI's "assignment of customers" theory.[5]

---

[3] JTI argues that by agreeing to assign its contract with a company called Millenium (so spelled, with one "n"), "Intelsat agreed that it would deliver to Juch-Tech a contractual relationship with Millenium in a condition in which Juch-Tech received a month-to-month customer or in which Juch-Tech would be able to decide whether to negotiate the renewal of the contract or terminate services." JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 8. Even if the Court were to consider the Millenium contract—which is not attached to JTI's counterclaim or incorporated by reference—on a motion to dismiss, the contractual provisions cited by JTI show that a month-to-month term and the possibility of renegotiation were at the option of either party, and Millenium's continued custom was not required or guaranteed by the Millenium contract.

[4] JTI alleges that it did not have a need to lease additional satellite capacity, but that "Intelsat induced Juch-Tech into entering into Service Order No. 22165 and the companion

### 2. Limited Liability Clauses

Both the NESA and the Transition Agreement contain broad exculpatory clauses that shield both parties from liability for breach of contract damages in most situations. *See* NESA ¶¶ 9.2–.3, ECF No. 3; Transition Agreement ¶ 4. In its motion to dismiss JTI's original breach of contract counterclaim, Intelsat argued that these provisions barred the recovery JTI sought. The Court disagreed, noting that a limited liability clause, while generally enforceable under New York contract law, may be pierced "if 'the misconduct for which it would grant immunity smacks of intentional wrongdoing.'" *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 109 (D.D.C. 2013) (quoting *Kalisch–Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983)). Because Intelsat does not expressly re-raise its limited liability argument in any new fashion in its motion to dismiss JTI's amended counterclaim, the Court addresses the issue solely to clarify its earlier ruling.

---

Transition Agreement by representing to Juch-Tech that . . . the customer contracts that it would assign to Juch-Tech generated a revenue stream . . . well in excess of the leasing fees for all of the additional bandwidth and [would] leave Juch-Tech with substantial additional bandwidth to lease to third parties at a profit." Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 28. These alleged facts read like a tort claim for fraudulent inducement, rather than a breach of contract claim. Appropriately, JTI has pleaded a fraudulent inducement claim as well, and the parol evidence rule does not bar consideration of external evidence to support that claim. *See Cirillo v. Slomin's Inc.*, 768 N.Y.S.2d 759, 930 (Sup. Ct. 2003) (citing *Sabo v. Delman*, 143 N.E.2d 906 (N.Y. 1957)); *see also infra* Part IV.C.

JTI does allege—tellingly, as part of its fraud claim and not its breach of contract claim— that Intelsat failed to disclose that the Millenium contract would expire before the date of assignment and a new one would not be entered. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 59(a). Because no more revenue was flowing in under the contract, it would have no value to JTI. Again, this allegation is more properly characterized as a fraudulent misrepresentation in the value of the contract to be assigned, and not as a failure of Intelsat to perform its obligations under the Transition Agreement, which promised assignment of a specific Millenium contract rather than a contract or relationship of a particular value.

[5] JTI submits that it is willing to file an interlineation removing the term "commercially reasonable" and inserting "valuable" or otherwise clarifying its content. *See* JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 9. However, this would not cure the defects described above.

In its opposition brief on the instant motion, JTI states that the Court held that JTI "has sufficiently pled that the NESA limited liability clause had been induced by fraud, which if proven would render the clause unenforceable." JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 5. But the Court's earlier holding was not intended to be so sweeping. The great weight of New York case law states that "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, *the misconduct for which it would grant immunity* smacks of intentional wrongdoing." *Kalisch–Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) (emphasis added); *see also Tomoka Re Holdings, Inc. v. Loughlin*, No. 03 Civ. 4904(NRB), 2004 WL 1118178, at *5 (S.D.N.Y. May 19, 2004) ("[U]nder New York law, a party may not insulate itself contractually from liability *for* fraud or gross negligence" (emphasis added)). In other words, under one plausible reading of the case law, the fraudulent, willful, or grossly negligent conduct itself must be committed in the course of the breach and not merely in the inducement of the contract. Because JTI also alleged defamation, tortious interference, and a number of other misdeeds among its counterclaims, the Court found that, for purposes of a Rule 12(b)(6) motion, JTI adequately alleged willful or reckless misconduct both in the inducement of the contract *and* in connection with the performance and breach of the contract itself. *See Intelsat*, 935 F. Supp. 2d at 109. The Court separately noted that JTI's fraudulent inducement claim has the potential to render the *entire contract* unenforceable. *See id.* (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 798 N.Y.S.2d 14, 16 (App. Div. 2005)). It did not go so far as to hold that fraudulent inducement alone would allow JTI to both pierce the exculpatory clause and sue for breach of contract damages. Indeed, typically, fraudulent inducement leaves a plaintiff the option to either rescind the entire contract or, alternatively, affirm the contract and sue for *tort* damages. *See,*

*e.g.*, *Turkish v. Kasentz*, 27 F.3d 23, 28 (2d Cir. 1994) (holding that, in the context of a settlement contract, the defrauded party "may either (1) rescind the settlement or (2) ratify the settlement, retain the proceeds, and institute an action to recover fraud damages").

The Court thus clarifies its earlier ruling to point out that it did not decide, and need not decide at this juncture, whether a court may pierce an exculpatory clause in a New York breach of contract claim only if the breach itself is fraudulent, willful, or reckless, or, alternatively, whether fraudulent inducement suffices. The parties have cited no New York authority that directly speaks to the issue. The Court expects the parties to brief this nuance more fully at the summary judgment stage.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

JTI's second cause of action alleges that Intelsat breached the implied covenant of good faith and fair dealing. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 45–50, ECF No. 30. "[T]here exists in every contract certain implied-by-law covenants, such as the promise to act with good faith in the course of performance." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978) (citation omitted); *see also* Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). The implied covenant is breached "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other part of the right to receive the benefits under the agreement." *Jaffe v. Paramount Commc'ns Inc.*, 644 N.Y.S.2d 43, 47 (App. Div. 1996). Thus, "[f]or a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgmt., Inc. v.*

*Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (App. Div. 1999) (mem.) (citations omitted).

JTI's claim is based on four different theories, asserting that Intelsat frustrated JTI's performance of the contract by (1) misrepresenting to JTI the condition of the assigned contracts; (2) withholding from JTI information about longstanding service problems with Intelsat's IS-1R and Atlanta Hub service; (3) withholding information about customer service complaints and failures to pay their bills; and (4) making false and incomplete statements to JTI customers and potential customers encouraging them to discontinue their contracts and business relationships with JTI. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 47. Intelsat argues that the first three theories of breach fail to state a claim because they relate to pre-contractual behavior that is not covered by the implied covenant. *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 10–11, ECF No. 37-1. With respect to JTI's fourth theory, Intelsat argues that the claim fails because it adds obligations that were not reasonably within the scope of the contracts and cannot be imposed by application of the implied covenant. *See id.* Intelsat further argues that rescission, which JTI seeks as an alternative remedy, *see* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 50, is unavailable on two grounds: first, because JTI has acted to affirm the contract by retaining the benefits it received; and second, because damages are calculable. *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 11–12.

### 1. Pre-Contractual Conduct

The implied covenant of good faith and fair dealing "relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct." *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998). Thus, an alleged breach of the implied covenant may only be predicated upon allegations of post-contractual

conduct.  Intelsat argues that three of the breach theories contained in JTI's counterclaim simply reiterate the allegations in JTI's fraudulent inducement claim, and are therefore based on pre-contractual conduct that is not covered by the implied covenant.  *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 10–11.  JTI responds that the allegations are based on "continuations of Intelsat's acts alleged under the fraud count."  *See* JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 13, ECF No. 39.

JTI's first theory is that Intelsat breached the implied covenant "by misrepresenting . . . the status of the assigned customers, revenue streams, and availability of post-contract period month-to-month extensions and new follow-on contracts . . . ."  Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 47.  JTI's counterclaims allege that Intelsat misrepresented the condition of the contracts in inducing JTI to sign the Transition Agreement, but they do not contain a specific allegation that the misrepresentations were repeated as part of Intelsat's post-contractual conduct. Thus, the Court must determine whether the counterclaims support an inference that Intelsat continued to misrepresent the status of the assigned contracts after the contract was formed.  The Court finds that such an inference is not plausible.  JTI has not alleged that Intelsat failed to assign the customer contracts, *see also supra* Part IV.A.1, and it is implausible that Intelsat would have reason to repeat any misrepresentations about the condition of the contracts after they were assigned.  Even if such an inference were drawn, it is not plausible that JTI's ability to perform under the Transition Agreement, or its enjoyment of the benefits of the agreement, would have been affected by misrepresentations relating to the revenue streams and other conditions of contracts that had *already* been assigned.  *See Aventine Inv. Mgmt.*, 697 N.Y.S.2d at 130 ("[T]he plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff.").

JTI's second and third theories both relate to Intelsat's alleged withholding of information about service problems with its satellite transponders, and customer service complaints about those services. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 47. The Court finds that the theories are plausibly based on Intelsat's continued withholding of that information post-contract, as JTI has alleged that Intelsat remained in possession of the relevant hardware during the transition period.[6] *See id.* ¶ 33. The Court will therefore dismiss JTI's first theory of breach, but allow the second and third to go forward.

## 2. Addition of Obligations

A breach of the implied covenant of good faith and fair dealing cannot be premised on the defendant's breach of an express contractual provision, but must instead be based on breach of an implied duty reasonably within the scope of the parties' bargain. *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002). "More succinctly expressed, 'the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included[.]'" *Rowe*, 385 N.E.2d at 569 (quoting 5 Williston on Contracts § `1293 (rev. ed. 1937)). Importantly, however, the implied covenant cannot be used to create independent obligations beyond those expressed in the contract. *See RBFC One, LLC v. Zeeks, Inc.*, 367 F. Supp. 2d 604, 625 (S.D.N.Y. 2005), *aff'd*, 171 F. App'x 902 (2d Cir. 2006). In its fourth theory of breach, JTI alleges that Intelsat made false and incomplete statements to JTI customers, encouraging them to discontinue their contracts with JTI and switch over to Intelsat or another

---

[6] The Court does not hold that Intelsat's alleged omissions, if proven to be true, would result in a breach of the implied covenant of good faith and fair dealing. It may be the case that the implied covenant does not impose a contractual duty upon Intelsat to disclose the information allegedly withheld because it was not reasonably within the scope of the bargain. *See Rowe*, 385 N.E.2d at 569. But the Court does not address the issue on the pending motion to dismiss, because Intelsat has not raised it.

satellite services provider.  *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 47.  It is

Intelsat's position that the claim fails because it essentially adds to the contract a non-existent

prohibition on competition between the parties.  *See* Intelsat's Mem. Supp. Mot. Dismiss Am.

Countercls. 11.  JTI does not substantively address this particular argument.

The Court will nonetheless allow JTI's counterclaim to go forward.  Intelsat relies on a

straw man in arguing for dismissal of JTI's claim.  This particular theory of breach does not

merely "boil[] down to an allegation that Intelsat violated the parties' agreements by competing

with Juch-Tech for customers."  *Id.*  Rather, JTI alleges that Intelsat *misled* customers into

discontinuing their contracts with JTI.  *See* Am. Answer 1st Am. Compl. & Am. Countercls.

¶ 47.  The allegation of bad faith pushes Intelsat's alleged behavior beyond mere competition.

Although the implied covenant cannot undermine Intelsat's general right to pursue its own

economic interests just because doing so would lessen JTI's benefits under the Transition

Agreement, *see, e.g.*, *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("[T]he

implied covenant does not extend so far as to undermine a party's 'general right to act in its own

interests in a way that may incidentally lessen' the other party's anticipated fruits from the

contract." (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 281 N.E.2d

142, 145 (N.Y. 1972))), the parties do not brief whether Intelsat's alleged use of *false and*

*incomplete* statements to customers of JTI breaches an implied promise by attempting to claw

back the benefits JTI expected to receive under the Transition Agreement.  Accordingly, the

Court does not decide that issue at this juncture.

### 3.  Rescission

JTI seeks damages on its claim for breach of the implied covenant of good faith and fair

dealing, but it also pleads in the alternative for rescission of the NESA, the Transition

Agreement, and Service Order No. 22165.  *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 50.  Intelsat argues that the prayer for rescission must be dismissed on two grounds:  first, because it is barred by JTI's election of remedies; and second, because there is an adequate remedy at law.  *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 11–12.

### a.  Election of Remedies

"New York's 'election of remedies' doctrine provides that 'one may not both affirm and disaffirm a contract . . . or take a benefit under an instrument and repudiate it.'"  *Arbor Realty Sr., Inc. v. Keener*, No. 11-cv-4626, 2013 WL 6709548 (E.D.N.Y. Dec. 19, 2013) (alteration in original) (quoting *Lumber Mut. Cas. Ins. Co. of N.Y. v. Friedman*, 28 N.Y.S.2d 506, 509 (Sup. Ct. 1941)).  Accordingly, courts will prohibit a party from pursuing a particular remedy where a plaintiff "ha[s] chosen from one of two or more co-existing inconsistent remedies, and in reliance upon that election, that party must also have gained an advantage, or the opposing party must have suffered some detriment."  *Prudential Oil Corp. v. Phillips Petrol. Co.*, 418 F. Supp. 254, 257 (S.D.N.Y. 1975).

Intelsat argues that, because the alleged breaches[7] began in March 2009 and JTI continued accepting the benefits of the agreements until Intelsat terminated them in October 2010, JTI elected to affirm the contracts and cannot now seek rescission.[8]  Intelsat omits an

---

[7] This analysis relates to Intelsat's alleged breach of the implied covenant of good faith and fair dealing.  In its opposition brief, JTI argues that rescission is available as a remedy where a contract is induced by fraudulent misrepresentation.  *See* JTI's Mem. Opp'n Mot. Dismiss Am. Countercls. 15, ECF No. 39.  But fraudulent misrepresentation is a separate cause of action, sounding in tort, and therefore entails a different analysis from rescission based on breach of contract.

[8] It does not escape the Court's attention that the parties largely cite case law dealing with a non-breaching party's attempt to *terminate* a contract (i.e., using the other party's material breach as an excuse for its own non-performance).  The Court notes that *rescission* is an extraordinary remedy for a mere breach of contract claim.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 735 (S.D.N.Y. 2000).  "[B]efore rescission

important step in the analysis: a plaintiff cannot elect a particular remedy unless it is aware of the defendant's breach, *see MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 710 (S.D.N.Y. 2012) ("The election of remedies doctrine requires knowledge of the alleged breach and an affirmative action that constitutes an election to continue performance."); *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995) ("Of course, a non-breaching party cannot be found to have elected to continue a contract in the face of a breach unless he knew of the breach."), *aff'd*, 101 F.3d 108 (2d Cir. 1996) (unpublished table decision), and JTI does not allege when it became aware of Intelsat's breaches. The Court will therefore not apply the election of remedies doctrine at this stage.

### b. Adequacy of Remedy at Law

Under New York law, the remedy of rescission "may be invoked 'only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored.'" *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 340 (S.D.N.Y. 2012) (alteration in original) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972)). Intelsat asserts, in a wholly conclusory fashion, that JTI "could be fully compensated by an award of money damages." *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 12. JTI ignores the issue altogether. The Court is unprepared, given the parties' anemic efforts in briefing the issue, to conclude that JTI's allegations foreclose the possibility that there is no adequate remedy at law. The Court will therefore allow JTI to pursue rescission as a remedy.

---

will be permitted the breach must be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (internal quotation marks omitted). The Court expects the parties to be cognizant of this distinction in their summary judgment briefing.

## C. Fraudulent Inducement (Count III)

In its third counterclaim, JTI pleads fraudulent inducement under D.C. law. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 51–65, ECF No. 30. Under D.C. law, the tort of fraud requires a plaintiff to show five elements: "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992). In cases such as this one, involving commercial contracts negotiated at arm's length, courts have imposed an additional requirement: "(6) that the defrauded party's reliance be *reasonable*." *Id.*

JTI's counterclaim alleges several misrepresentations, both affirmative and by omission. First, JTI alleges that, in order to induce JTI to enter into the Transition Agreement, Intelsat agents represented to JTI that there would be little capacity left on IS-14 once customers on IS-1R were migrated. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 54. JTI also alleges that, in a March 19, 2009, email, Intelsat represented that the revenues from assigned customers under the Transition Agreement would exceed JTI's monthly payments to Intelsat, resulting in a profit for JTI. *See id.* ¶ 56. JTI also alleges that Intelsat knew, but failed to disclose, that (1) at least one customer had failed to pay its service bills and would not renew its contract; (2) several other customers had complained that the Atlanta Hub and IS-1R service was poor, causing them to lose customers; and (3) at least one customer was threatening to terminate its contract due to the poor service. *See id.* ¶ 59. Intelsat argues that the claim must be dismissed because Intelsat had no duty to disclose the information allegedly withheld, and because JTI's reliance on any alleged misrepresentations was not objectively reasonable. *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 12–20, ECF No. 37-1.

1. Duty to Disclose

Where a fraud claim is based on the defendant's failure to disclose material facts, rather than an affirmative misrepresentation, a modified standard applies. "D.C. law provides that nondisclosure of a fact can constitute a fraudulent misrepresentation in 'certain very limited circumstances.'" *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51 (D.D.C. 2011) (quoting *Resolution Trust Corp. v. District of Columbia*, 78 F.3d 606, 609 (D.C. Cir. 1996)). Thus, it has long been held that "mere silence does not constitute fraud unless there is a duty to speak." *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948); *accord Saucier v. Countrywide Home Loans*, 64 A.3d 428, 439 (D.C. 2013). A duty to speak arises under several different circumstances. *See generally* Restatement (Second) of Torts § 551(2) (1977). Importantly for the instant case, and as Intelsat recognizes, one of those circumstances arises where disclosure of the omitted fact is necessary in order to make a defendant's affirmative statements not misleading. *See id.* § 551(2)(b); Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 19 n.16.

JTI alleges that in a March 19, 2009, email, Alicia Schwarcz of Intelsat sent a financial analysis to JTI detailing the revenues under the contracts that would be assigned as part of the Transition Agreement. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 56. The spreadsheet shows[9] billings for *all* customers, including those who Intelsat allegedly knew—but failed to disclose—were (1) refusing to pay their bills, (2) complaining about the satellite service, and (3) threatening to terminate their contracts. *See* Pl.'s Ex. 1, ECF No. 38. It is Intelsat's position that Ms. Schwarcz's email was not misleading, because the analysis contained a column

---

[9] On a motion to dismiss, the Court also considers documents incorporated by reference into the complaint, or documents on which a claim necessarily relies. *See supra* note 2. The Court thus considers Ms. Schwarcz's email in connection with JTI's fraud claim, and JTI does not appear to dispute the propriety of this practice.

indicating that several of the contracts were month-to-month or about to expire, and therefore JTI

could not have expected that it would receive the revenues shown in the spreadsheet. *See*

Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 16–19. But the possible impending

expiration or termination of the customer contracts does not speak directly to the omissions

alleged, which, instead, relate to Intelsat's poor satellite service and the customers' current non-

payment. Moreover, Intelsat's inference requires certain factual judgments that are inappropriate

for resolution at the Rule 12(b)(6) stage. It is at least plausible at this stage that the spreadsheet,

showing in dollars and cents the billings due for all customers covered by the Transition

Agreement, misled JTI by creating a reasonable expectation that those customers were currently

paying those bills and not threatening to terminate their contracts due to poor service. The Court

thus rejects Intelsat's "duty to disclose" argument while reserving judgment whether JTI will

ultimately prevail on the merits for this required element of its fraudulent omission theories.

### 2. Reasonable Reliance

Where the alleged fraud has occurred in an arm's length transaction between commercial

entities, the defrauded party's reliance on the defendant's misrepresentation must be reasonable.

*See Hercules & Co.*, 613 A.2d at 923. Thus, "even if 'representations are false or misleading, it

is unreasonable for a party to rely on those representations if the party had an adequate

opportunity to conduct an independent investigation and the party making the representation did

not have exclusive access to such information.'" *Wash. Inv. Partners of Del, LLC v. Sec. House,

K.S.C.C.*, 28 A.3d 566, 576 (D.C. 2011) (quoting *Drake v. McNair*, 993 A.2d 607, 622 (D.C.

2010)). Intelsat argues that JTI's reliance on Ms. Schwarcz's analysis was not reasonable

because JTI could have obtained payment information from the customers themselves, and

because the analysis itself indicated that the revenues due under the contracts may be short-

lived.[10]  *See* Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 16–20.  JTI argues that these

are questions of fact inappropriate for resolution on a motion to dismiss.  *See* JTI's Mem. Opp'n

Mot. Dismiss Am. Countercls. 18, ECF No. 39.

Intelsat argues that Ms. Schwarcz's email, which shows several of the customer contracts

on a month-to-month term or soon to expire, should have indicated to JTI that it needed to

conduct due diligence on the customers themselves.  *See* Intelsat's Mem. Supp. Mot. Dismiss

Am. Countercls. 15–17.  Indeed, Ms. Schwarcz's email specifically warned that "[t]here are

some discrepancies between what is under contract and what we show as in use that can only be

cleared up by working with each end user individually."  *Id.* at 17 (quoting Pl.'s Ex. 1).

Moreover, Intelsat argues, JTI should have detected an irregularity warranting further

investigation when Intelsat refused JTI's request to disclose customer invoices and billing

information.  *See id.* at 19.  While it is true that "[r]eliance is unreasonable when a plaintiff fails

to investigate her suspicions about the veracity of the defendant's representations before entering

into an agreement[,]" *Bakeir v. Capital City Mortg. Corp.*, 926 F. Supp. 2d 320, 338 (D.D.C.

2013) (citing *Drake v. McNair*, 993 A.2d 607, 624–25 (D.C. 2010)), it is also true that "[t]he

reasonableness of a plaintiff's reliance is a question of fact," *C & E Servs., Inc., v. Ashland, Inc.*,

498 F. Supp. 2d 242, 260 (D.D.C. 2007) (quoting *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C.

1987)) (internal quotation marks omitted).

---

[10] Intelsat asserts that, in rejecting its earlier argument that JTI did not plead reasonable
reliance, the Court "improperly shifted to Intelsat . . . the burden for this element of fraud."  *See*
Intelsat's Mem. Supp. Mot. Dismiss Am. Countercls. 14 n.12.  While it is a plaintiff's burden to
allege facts supporting the elements of its claim, *see Winstead v. EMC Mortg. Corp.*, 697 F.
Supp. 2d 1, 4 (D.D.C. 2010), "[a]ll federal courts are in agreement that the burden is on the
moving party [in a Rule 12(b)(6) motion] to prove that no legally cognizable claim for relief
exists[,]" 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).  Because
JTI's original counterclaim pleaded reasonable reliance, *see* Answer & Countercls. ¶ 54, ECF
No. 10, it was Intelsat's burden as movant to demonstrate that the pleading was incomplete or
implausible.

Intelsat's reasonable reliance argument, like its duty to disclose argument, requires a number of factual leaps beyond the content alleged in JTI's counterclaims. Although there is a duty in arm's length transactions to conduct one's due diligence, it is plausible from JTI's allegations that an independent investigation would not have revealed the information Intelsat allegedly withheld. JTI alleges that it asked Intelsat to provide information regarding customer revenues and points of contact, but Intelsat refused to produce it, citing customer confidentiality. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 60. Considering Intelsat's own apparent position that its customers would be displeased with it disclosing such information, it is plausible that the customers themselves would have been just as reticent had JTI approached them directly. This seems especially true of those customers who were refusing to pay their bills—it is difficult to see why a customer would be forthcoming with such information to a third party to whom it did not yet owe any duty. The Court will therefore allow Intelsat's fraudulent inducement claim to proceed.

## V. CONCLUSION

For the foregoing reasons, the Court will dismiss JTI's breach of contract claim as to its "assignment of customers" theory, and will also dismiss JTI's claim for breach of the implied covenant of good faith and fair dealing as it relates to Intelsat's alleged misrepresentations about the condition of the assigned contracts. The remainder of Intelsat's motion will be denied. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 10, 2014                                        RUDOLPH CONTRERAS
                                                            United States District Judge