| | | |
|---|---|---|
| INTELSAT USA SALES LLC, | : | |
| | : | |
| Plaintiff and Counter-Defendant, | : | Civil Action No.: 10-2095 (RC) |
| | : | |
| v. | : | Re Document Nos.: 59, 74 |
| | : | |
| JUCH-TECH, INC., | : | |
| | : | |
| Defendant and Counter-Claimant. | : | |

# MEMORANDUM OPINION

**DENYING JUCH-TECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
DENYING JUCH-TECH'S MOTION TO STRIKE**

## I. INTRODUCTION

Plaintiff and Counter-Defendant Intelsat USA Sales LLC ("Intelsat Sales"), formerly known as Intelsat USA Sales Corporation, brought suit against Defendant and Counter-Claimant Juch-Tech, Inc. ("Juch-Tech") alleging breach of contract and unjust enrichment on the theory that Juch-Tech refused to pay for services rendered after Intelsat Sales performed all of its contractual obligations. Juch-Tech filed an amended counterclaim that included several counts, many of which either have been dismissed by stipulation or limited through this Court's prior rulings. Now before the Court is Juch-Tech's motion seeking partial summary judgment on the narrow but monetarily significant issue of whether Intelsat Sales is entitled as a matter of law to recover contract acceleration damages pursuant to the parties' Non-Exclusive Service Agreement. For the reasons discussed below, the Court will deny Juch-Tech's motion.

## II. FACTUAL BACKGROUND

Intelsat Sales and Juch-Tech are companies that operate in the satellite communications industry. Specifically, Intelsat Sales provides satellite bandwidth — also known as "space segment" — to users and network operators; Juch-Tech leases such space segment from companies like Intelsat Sales and others. On January 7, 2005, Intelsat Sales and Juch-Tech ratified a contract entitled the Non-Exclusive Service Agreement No. 04031-000 ("NESA"). *See generally* NESA, ECF No. 68, Ex. 1. The NESA sets forth the terms governing Intelsat Sales's provision of space segment to Juch-Tech. Pursuant to the NESA, Intelsat Sales and Juch-Tech ratified Intelsat Transponder Service Orders ("Service Orders"), which lay out the specific terms for Juch-Tech's leasing of space segment, including pricing, technical specifications, and the length of the leases. The companies entered into multiple Service Orders relating to the leasing of space segment on several different satellites during the course of their contractual relationship. *See, e.g.*, ECF No. 68, Exs. 2-9 (Service Orders). All Service Orders, and the amendments and extensions thereto, state that "[t]he Service is subject to the terms and conditions of the Master Service Agreement," which is the NESA dated January 7, 2005. *See, e.g.*, ECF No. 68, Ex. 3 at 27 (Service Order No. 16227); Ex. 4 at 32 (Service Order No. 15228).

Turning back to the NESA, the agreement includes several provisions relating to when and how Intelsat Sales may terminate the contract and the accompanying Service Orders. Of relevance to deciding Juch-Tech's motion, the NESA states at Section 8.1(b):

> At its sole option, Intelsat may suspend Service or terminate this Agreement or some or all outstanding Service Contracts by giving written notice if the Customer [*i.e.*, Juch-Tech] … fails to make payment of any sum due and owing to Intelsat under a Service Contract and such failure continues for a period of 15 days after provision of written notice of such failure by Intelsat.

NESA, ECF No. 68, Ex. 1 at § 8.1(b). The NESA further provides at Section 8.4 that "[i]n the event this Agreement is terminated by Intelsat under this Section 8, it shall mean termination of

2

every then outstanding Service Contract." *Id.* § 8.4. Finally, the agreement includes a contractual acceleration damages clause[1] at Section 8.5:

> Upon termination of this Agreement (or a Service Contract) for whatever reason, Intelsat shall no longer be required to provide for any Services and the Customer shall cease using the Services and Satellite Capacity and any outstanding indebtedness of the Customer (under the Agreement or the Service Contract as appropriate) to Intelsat shall become immediately due and payable together with any interest thereupon, provided that in the event that this Agreement is terminated by Intelsat under this Section 8, the amounts payable by the Customer to Intelsat shall include any Charges that would have been payable in accordance with all outstanding Service Contracts of the Customer so terminated (at the then-current rate), plus the costs of collection[.]"

*Id.* § 8.5.

On October 6, 2010, Chris Nibecker, a manager at Intelsat Corporation ("Intelsat Corp."), sent a notice letter to Juch-Tech's President, Walter Juchniewicz, stating that Juch-Tech was in default under the NESA for the amount of $2,419,865 and informing Juch-Tech that unless the full balance was paid within fifteen days, "Intelsat" was entitled to terminate the agreement under Section 8.1. *See* Nibecker Letter, ECF No. 75, at 4. This notice was written on Intelsat Corp.'s letterhead, and although it properly described the NESA in the "Re" line by its identification number (No. 04031) and execution date (January 7, 2005), the letter incorrectly stated that the NESA was between Juch-Tech and Intelsat Corp., not Intelsat Sales. *See id.* On October 8, 2010, Juch-Tech's Walter Juchniewicz emailed Chris Nibecker, among others, "formally acknowledg[ing] receipt … of the email form (sic) Chris." ECF No. 75, at 9 (Oct. 8, 2010, email from Juchniewicz to Rasmussen, with Nibecker cc'd). Intelsat Sales terminated the NESA and the Service Orders on or around October 28, 2010, more than fifteen days after the

---

[1] An acceleration damages clause is a provision affording a party the right to accelerate the payment date of a contract or instrument's entire amount upon the occurrence of a specified event, such as termination or breach of the agreement. *See* 4B N.Y. Prac., Com. Litig. in New York State Courts § 75:48 (3d ed.).

3

Nibecker letter. *See* ECF No. 59-13, Ex. 11 (various emails between Juch-Tech and Intelsat). The timing of the termination is not presently at issue.

Chris Nibecker was an employee of Intelsat Corp. at all times during the relevant events, *see* Nibecker Aff., ECF No. 75, at 1, ¶ 2, but he did have interactions with Juch-Tech on behalf of Intelsat Sales regarding billing and collections under the NESA. *See id.* at 1-2, ¶ 3. Indeed, he was one of the main contacts for Juch-Tech about its billing with Intelsat Sales between 2008 and 2010. *See id.* According to Nibecker's affidavit, this is because Intelsat Sales gave the billing department at Intelsat Corp. responsibility for sending invoices to Juch-Tech under the NESA and the Service Orders.[2] *See id.* Although the exact corporate relationship between Intelsat Sales and Intelsat Corp. is unclear, it is undisputed that: they are separate legal entities; only Intelsat Sales (and not Intelsat Corp.) was a signatory to the NESA; and only Intelsat Sales (and not Intelsat Corp.) was a signatory to the Service Orders. Finally, whereas the Nibecker letter stated that Juch-Tech was in default for $2,419,865, Intelsat Sales asserts through its

---

[2] In a separate motion, Juch-Tech moves to strike certain statements in the affidavits of Stephen Chernow and Chris Nibecker, both of which were submitted by Intelsat Sales in support of its opposition to the summary judgment motion. *See generally* Def.'s Mot. Strike, ECF No. 74. First, because the Court does not rely on the Chernow affidavit to decide the summary judgment motion, Juch-Tech's motion to strike is denied as moot on that issue.

Second, Juch-Tech moves to strike only one sentence in the Nibecker affidavit: "The billing department of Intelsat Corporation was responsible for sending invoices to Juch-Tech under its agreements with Intelsat USA." Def.'s Mem. Supp. Mot. Strike, ECF No. 74-1, at 6-7 (citing Nibecker Aff., ECF No. 75, at 1, ¶ 3). Juch-Tech provides no basis for disputing that this affirmation is based on Nibecker's personal knowledge; indeed, given his position as Manager of Credit and Collections at Intelsat Corp., it appears obvious to the Court that Nibecker would personally know about the billing practices of his employer, including in regard to the NESA and the Service Orders. The affidavit therefore satisfies Rule 56, and Juch-Tech's arguments about this being a statement by a lay person or lacking documentary support are without merit under the Federal Rules. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Accordingly, the Court denies Juch-Tech's motion to strike as to the Nibecker affidavit.

discovery responses that Juch-Tech is liable for total damages in the amount of $43,419,032.04 due to its alleged breach of contract.[3] *See* ECF No. 59-15, Ex. 13 at 8 (Intelsat Sales's Preliminary Disclosures).

Now before the Court is Juch-Tech's motion for partial summary judgment. Juch-Tech argues that the acceleration damages provision is not available as a basis for calculating damages if Intelsat Sales wins its breach of contract claim because Intelsat Sales failed to provide notice regarding termination of the agreement in compliance with Sections 8.1 and 8.5 of the NESA. *See generally* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 59-2. As such, Juch-Tech seeks relief ordering that Intelsat Sales's potential damages are limited to proven actual losses and compensatory damages, which would be significantly less than the more than $40 million in total damages to which Intelsat Sales believes it is entitled if contractual acceleration damages are permitted.

### III. ANALYSIS

#### A. Legal Standard For Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord. Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When Rule 56 is invoked, the moving party

---

[3] In its amended complaint, Intelsat Sales alleges that Juch-Tech is liable for $30,456,390.50 in damages. *See* Amend. Compl., ECF No. 3, at ¶ 9.

has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324 (citation omitted). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position — "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

### B. Condition Precedent

The initial question before the Court is whether notice under Section 8.1(b) of the NESA is a condition precedent to acceleration damages in Section 8.5. When determining a motion for summary judgment based upon a written contract, "the construction of an unambiguous contract is for the court to pass on, and circumstances extrinsic to the agreement or varying interpretations of the contract provisions will not be considered when the intention of the parties can be gathered from the instrument itself."[4] *Yanuck v. Simon Paston & Sons Agency*, 209 A.D.2d 207, 208 (N.Y. App. Div. 1994). But when the "interpretation of contract terms or provisions is

---

[4] The NESA contains a choice-of-law provision selecting New York law, *see* NESA, ECF No. 68, Ex. 1 at § 16, and the parties do not dispute the applicability of New York contract law here.

6

susceptible to at least two reasonable interpretations, and intent must be gleaned from disputed evidence or from inferences outside the written words, it becomes an issue of fact that must be resolved by trial." *Id.*

A condition precedent is "an act or event which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Preferred Mortgage Brokers, Inc. v. Byfield*, 282 A.D.2d 589, 590 (N.Y. App. Div. 2001) (citation and quotation omitted). Under New York contract law, "[i]t must clearly appear from the agreement itself that the parties intended a provision to operate as a condition precedent"; "[i]f the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent." *Ashkenazi v. Kent S. Assocs., LLC*, 51 A.D.3d 611, 611-12 (N.Y. App. Div. 2008) (citation and quotation omitted). Here, Section 8.5 states, in relevant part: "provided that **in the event that** this Agreement is terminated by Intelsat under this Section 8, the amounts payable by the Customer to Intelsat shall include any Charges that would have been payable in accordance with all outstanding Service Contracts of the Customer so terminated." NESA, ECF No. 68, Ex. 1 at § 8.5 (emphasis added).

The Court finds that this language unambiguously creates an express condition precedent such that acceleration damages are available only if the agreement first is terminated in accordance with Section 8, specifically Section 8.1. *See Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995) (explaining that the "agreement unambiguously establishes an express condition precedent rather than a promise, as the parties employed the unmistakable language of condition ('if,' 'unless and until')"); *Sutton v. E&B Giftware LLC*, 41 Misc. 3d 1240(A), at *5 (N.Y. Sup. Ct. 2013) (explaining that "the use of the language 'in the event that …' is a form of construction frequently used to establish a condition

7

precedent"); *see also Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 121 (2d Cir. 1985) (stating that the "in the event …" clause is "a condition precedent to the operation of the remainder of the entire section" in the agreement); *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC*, 381 F. Supp. 2d 250, 256 (S.D.N.Y. 2005) ("The plain language of the 'Valuation' section — providing for [actual cash value] 'in the event' the insured elects not to rebuild — operates as a condition precedent to making a claim for [actual cash value]." (citation omitted)).

### C. Preservation For Summary Judgment

The next question is whether Juch-Tech properly pleaded noncompliance with a condition precedent such that it now may raise the issue through its motion for partial summary judgment. Under New York law, if a plaintiff fails to allege performance of a contractual condition precedent, a defendant must deny compliance with the condition precedent with particularity and the failure to do so constitutes waiver of the defense; conversely, when a plaintiff does allege compliance with a condition precedent, a general denial by the defendant suffices to place the allegations at issue such that the condition precedent question is preserved. *See Roel P'ship v. Amwest Sur. Ins. Co.*, 258 A.D.2d 780, 781 (N.Y. App. Div. 1999).

Here, Intelsat Sales does not specifically allege in the amended complaint satisfaction of the condition precedent for acceleration damages; instead, it simply asserts that it "has performed all its obligations under the NESA and the Service Contracts." Amend. Compl., ECF No. 3, at ¶ 6. The burden thus rests on Juch-Tech to provide a general denial that Intelsat Sales complied with any relevant conditions precedent. The case of *Carr v. Birnbaum* is particularly insightful as to whether Juch-Tech met its burden. 75 A.D.3d 972 (N.Y. App. Div. 2010). In *Carr*, the New York court explained that "as the complaint alleged that plaintiffs fulfilled all of the obligations contained in the development agreement, defendants' general denials were sufficient

8

to place the performance or occurrence of the conditions precedent in issue." *Id*. at 973; *see also U.S. Fid. & Guar. Co. v. Delmar Dev. Partners, LLC*, 22 A.D.3d 1017, 1022 (N.Y. App. Div. 2005) ("To the extent that defendant's claims of nonperformance can be characterized as conditions precedent, plaintiff alleged full performance of its obligations under the contract in its complaint, rendering defendant's general denials sufficient to place plaintiff's allegations at issue."). Analogous facts are at issue here. In its answer, Juch-Tech denied Intelsat Sales's assertion that it performed all obligations under the NESA. *See* Answer, ECF No. 10, at ¶ 6. Thus, the Court finds that Juch-Tech preserved the issue of whether Intelsat Sales complied with the condition precedent for acceleration damages.

### D. Adequacy Of The Nibecker Letter

Juch-Tech asserts through its motion for partial summary judgment that Intelsat Sales is not entitled to acceleration damages because there is no genuine dispute of material fact that it failed to comply with the mandatory notice provision in Section 8.1 of the NESA. Thus, according to Juch-Tech, Intelsat Sales cannot demand acceleration damages under Section 8.5. Section 8.1(b) of the NESA contains sparse details about how notice must be provided. The clause states:

> At its sole option, Intelsat may suspend Service or terminate this Agreement or some or all outstanding Service Contracts by giving written notice if the Customer … fails to make payment of any sum due and owing to Intelsat under a Service Contract and such failure continues for a period of 15 days after provision of written notice of such failure by Intelsat.

NESA, ECF No. 68, Ex. 1 at § 8.1(b). Although the clause provides that "Intelsat [Sales]" may terminate the NESA and the Service Contracts, it provides no other guidance except that the notice be in writing and that Juch-Tech be given fifteen days after receiving notice to pay the outstanding sums due.

Juch-Tech argues that the October 6, 2010, Nibecker letter contained several defects which make it inadequate under Section 8.1(b), namely that: it was drafted on Intelsat Corp. letterhead; it was signed by Nibecker, an Intelsat Corp. employee; and the "Re" line described the NESA as between Juch-Tech and Intelsat Corp., whereas only Intelsat Sales was a party to the agreement. *See generally* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 59-2; *see also* Nibecker Letter, ECF No. 75, at 4. Further, because the Nibecker letter stated that "Intelsat" stands for "Intelsat Corp." within the document, each mention of "Intelsat" in the letter became a reference to Intelsat Corp., while the only proper entity with rights and obligations under the NESA is Intelsat Sales.[5] *See* Nibecker Letter, ECF No. 75, at 4.

Competent evidence in the record, however, shows that Juch-Tech received, and understood the import of, the Nibecker letter; indeed, on October 8, 2010, Juch-Tech's Walter Juchniewicz emailed Chris Nibecker, among others, "formally acknowledg[ing] receipt … of the email form (sic) Chris." ECF No. 75, at 9 (Oct. 8, 2010, email from Juchniewicz to Rasmussen, with Nibecker cc'd). Juch-Tech does not provide evidence suggesting that it was confused or misled about whether the letter referred to the agreement with Intelsat Sales at issue in this action because, besides wrongly listing Intelsat Corp. as a party to the agreement, the letter correctly identified the relevant contract as NESA "No. 04031 dated January 7, 2005." *See* Nibecker Letter, ECF No. 75, at 4. Juch-Tech also does not contest that the account statements attached to the letter correctly listed Juch-Tech's account number with Intelsat Sales (#5210) and properly identified the correct billing information under the NESA and the Service Orders between Juch-

---

[5] For example, the letter states: "This serves as formal notice that unless Intelsat [*i.e.*, Intelsat Corp.] receives payment of the Outstanding Balance of US$2,419,865.00 within 15 days from the date of this letter, Intelsat [*i.e.*, Intelsat Corp.] may, in accordance with Article 8.1 of the Non-Exclusive Agreement, terminate your Services without further notice." Nibecker Letter, ECF No. 75, at 4.

Tech and Intelsat Sales. *See* Attach. to Nibecker Letter, ECF No. 75, at 5-8. Finally, Juch-Tech does not contradict evidence showing that it never objected to the letter until the instant motion was filed several years after the agreement was terminated; in fact, evidence shows that Juch-Tech's top executives, President Walter Juchniewicz and CEO Ken Hyde, communicated with Chris Nibecker following receipt of the letter to discuss the impending termination. *See* ECF No. 75, at 9-15 (various emails between Juch-Tech and Nibecker); *see also* Nibecker Aff., ECF No. 75, at 1-2, ¶ 3.

Once again, the Court must look to New York contract law to determine whether the letter constituted proper notice. New York courts repeatedly have held that "[s]trict compliance with contract notice provisions is not required in commercial contracts when the contracting party receives actual notice and suffers no detriment or prejudice by the deviation." *J.C. Studios, LLC v. Telenext Media, Inc.*, 32 Misc. 3d 1211(A), at *9 (N.Y. Sup. Ct. 2011); *accord. MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 CIV. 1615 CM, 2012 WL 1107648, at *10 (S.D.N.Y. Mar. 30, 2012) (applying New York law); *Suarez v. Ingalls*, 282 A.D.2d 599, 600 (N.Y. App. Div. 2001); *Dellicarri v. Hirschfeld*, 210 A.D.2d 584, 585 (N.Y. App. Div. 1994). Thus, when the party against whom the contract is being enforced received actual notice and was afforded the protections the notice provision was intended to provide, New York law does not demand perfect compliance with a notice clause. *See, e.g.*, *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*, 706 F. Supp. 2d 350, 360 (S.D.N.Y. 2009) (applying New York law and holding that "notice was effective" when the defendant-company failed to send termination letters by registered mail, as required by the contract, because there was "no dispute that [the plaintiff-company] received [the termination] letters, and [the plaintiff-company] does not claim prejudice" from the deviation); *Gorey v. Allion Healthcare Inc.*, 18 Misc. 3d 1118(A),

11

at *9-10 (N.Y. Sup. Ct. 2008) (citing New York cases and explaining that "contractual notice provisions are strictly enforced" only when "the moving party was not given the notice to which they were entitled in order [to] receive the protection afforded by the notice provision"); *see also Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977) (explaining that a notice provision should not be construed "as if it were a common law pleading requirement under which every slip would be fatal").

The Court finds that Juch-Tech seeks an overly-technical and rigid reading of the notice provision that is inconsistent with the New York contract law described above.[6] Instead, evidence in the record supports the facts that: Juch-Tech received actual notice through the Nibecker letter of its continuing default in violation of the NESA and the Services Orders with Intelsat Sales; Juch-Tech knew the letter referred to the correct NESA with Intelsat Sales, despite the error in the "Re" line naming Intelsat Corp. as a party to the agreement; and Juch-Tech was given at least fifteen days to comply before the agreement was terminated. *See, e.g.*, *MyPlayCity*, 2012 WL 1107648, at *11 ("While the notice contained a typographical error, there is no dispute that the Notice of Termination was sent to [the plaintiff-company] through its officers, or that the notice was intended for [the plaintiff-company]."); *J.C. Studios*, 32 Misc. 3d 1211(A), at *9 (granting defendant's motion to dismiss when "[p]laintiff does not dispute that it received actual notice of the termination of the [] Agreement, and plaintiff does not allege any

---

[6] Under New York law, strict compliance with written notice provisions is required for public contracts, with limited exceptions. *See Honeywell, Inc. v. J.P. Maguire Co., Inc.*, No. 93CIV.5253, 1999 WL 102762, at *23 (S.D.N.Y. Feb. 24, 1999) (applying New York law and citing cases). But because the contract at issue in this action is a commercial agreement between two sophisticated, private parties, the rigid rule Juch-Tech incorrectly argues for clearly does not apply. The Court also feels compelled to note that Juch-Tech failed to cite a single New York contract case in its memorandum in support of the motion for partial summary judgment, thereby leaving to Intelsat Sales and the Court the responsibility for sorting out the relevant legal standards.

detriment caused to it by any claimed deviation from the terms of the [] Agreement"); *Ives v. Mars Metal Corp.*, 23 Misc. 2d 1015, at *1017 (N.Y. Sup. Ct. 1960) (holding that when "actual notice of termination has in fact been given, the form is of little import," even when the form violates the contract, and "it would be hypertechnical in the extreme to hold otherwise").

Further, there exists a triable issue as to whether Juch-Tech suffered actual prejudice from the errors in the Nibecker letter, as Juch-Tech does not provide any evidence that such prejudice occurred; instead, a genuine dispute of fact exists that Juch-Tech knew upon receipt of the letter exactly which agreement the notice addressed and the obligations on which it was in default, thus suggesting that it suffered no prejudice. Although the issues with the letter rise above mere typographical errors at least insofar as the letter was sent from Intelsat Corp. rather than Intelsat Sales, this deviation does not render automatically the notice null and void as a matter of law. Rather, even accepting as true that Intelsat Sales could not or did not delegate to Intelsat Corp. the power to issue notice of termination, a triable issue of fact exists as to whether the Nibecker letter was sufficient to convey the required information about Juch-Tech's default status and to set in motion the process for terminating the NESA and the Service Orders after fifteen days, which is what the notice provision was intended to accomplish and what happened next.

In fact, Juch-Tech's argument for summary judgment becomes even more specious when considering the evidence that it had extensive prior contacts with Chris Nibecker and Intelsat Corp. in relation to the Intelsat Sales NESA and the Service Orders before receiving the notice letter. As set forth in Nibecker's affidavit, he was one of the main contacts for Juch-Tech regarding its billing and payments to Intelsat Sales between 2008 and 2010. *See* Nibecker Aff., ECF No. 75, at 1-2, ¶ 3. This is because evidence shows that the billing department at Intelsat

Corp. was given responsibility by Intelsat Sales for sending invoices to Juch-Tech under the NESA and the Service Orders. *See id.* Thus, the evidence in the record creates a genuine dispute of fact that Juch-Tech knew Intelsat Corp. had acted on behalf of Intelsat Sales in the past by carrying out various aspects of the agreements, particularly in relation to billing and debt collection procedures, which suggests that the notice was adequate and that Juch-Tech suffered no prejudice. The Court therefore concludes that Juch-Tech is not entitled to summary judgment because it has failed to demonstrate that no genuine dispute of material fact exists as to whether the Nibecker letter constituted insufficient notice under Section 8 of the NESA.[7]

### IV. CONCLUSION

For the foregoing reasons, the Court denies Juch-Tech's motion for partial summary judgment and motion to strike. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: June 30, 2014                                                RUDOLPH CONTRERAS
                                                                    United States District Judge

---

[7] Because the Court denies summary judgment on Juch-Tech's argument that the Nibecker letter constituted inadequate notice under the NESA, the Court need not address Intelsat Sales's arguments about whether Juch-Tech waived its right to challenge the sufficiency of notice by not objecting promptly, or whether Intelsat Corp. was properly authorized to issue the notice as Intelsat Sales's agent. Further, the Court does not, and need not, decide at this time whether the contract acceleration damages clause is enforceable as a liquidated damages provision. Finally, the parties are reminded that leave is required before filing briefs that do not comply with the Federal Rules of Civil Procedure and the Local Rules of this Court.