UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| INTELSAT USA SALES LLC, | : | | |
| | : | | |
| Plaintiff and Counter-Defendant, | : | Civil Action No.: | 10-2095 (RC) |
| | : | | |
| v. | : | Re Document No.: | 44 |
| | : | | |
| JUCH-TECH, INC., | : | | |
| | : | | |
| Defendant and Counter-Claimant. | : | | |

# MEMORANDUM OPINION

DEFERRING A DECISION ON INTELSAT'S MOTION FOR RULE 11 SANCTIONS

## I. INTRODUCTION

Plaintiff and Counter-Defendant Intelsat USA Sales LLC ("Intelsat"), formerly known as Intelsat USA Sales Corporation, brought suit against Defendant and Counter-Claimant Juch-Tech, Inc. ("Juch-Tech") alleging breach of contract and unjust enrichment on the theory that Juch-Tech refused to pay for services rendered after Intelsat performed all of its contractual obligations. Juch-Tech filed original and amended counterclaims that included several counts, many of which either were dismissed by stipulation or limited through this Court's prior rulings. Now before the Court is Intelsat's motion seeking Rule 11 sanctions against Juch-Tech based on certain allegations in those counterclaims. For the reasons discussed below, the Court will defer ruling on Intelsat's motion because Juch-Tech has failed to provide sufficient information from which the Court can ascertain whether Rule 11 was violated. The Court therefore will order Juch-Tech to submit an affidavit setting forth details regarding its pre-filing inquiry and explaining the factual and evidentiary bases for the counterclaims and allegations that Intelsat argues are in violation of Rule 11.

## II. BACKGROUND

### A. Factual Allegations[1]

Intelsat and Juch-Tech are companies that operate in the satellite communications industry. In 2005, the parties entered into a contractual agreement titled the Non-Exclusive Service Agreement ("NESA"), *see* 1st Am. Compl. Ex. 1, ECF No. 3, under which Juch-Tech leased satellite capacity from Intelsat on two satellites so that Juch-Tech could provide its customers with communications services. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 26, ECF No. 30. In early 2009, the parties entered into an additional agreement, the "Transition Agreement," *see* Am. Countercls. Ex. A, ECF No. 30-1, and a companion agreement, "Service Order No. 22165," under which Juch-Tech agreed to lease additional satellite capacity from Intelsat in exchange for, among other things, Intelsat's sale of a Linkstar Hub and assignment of Intelsat's contracts with certain customers who were using that satellite capacity at the time. *See* Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 27-28. Juch-Tech was to lease capacity on Intelsat's "IS-1R" satellite, which was already in orbit at the time, and then transition to the "IS-14," a satellite that would become operational several months later. *See id.* ¶ 27.

Juch-Tech claims that it did not need the additional capacity for itself, but instead was induced to enter the Transition Agreement and Service Order No. 22165 as a result of certain representations about the value of the contracts Intelsat would assign. *See id.* ¶ 28. Juch-Tech asserts that Intelsat, through its agents, represented that once customers on IS-1R were migrated

---

[1] Intelsat previously filed two motions to dismiss, both of which the Court granted in part and denied in part. The memorandum opinions accompanying the orders provide a more detailed overview of the facts, which the Court incorporates by reference in this opinion. *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101 (D.D.C. 2013) (ECF No. 22); *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, No. CV 10-2095 (RC), 2014 WL 905323 (D.D.C. Mar. 10, 2014) (ECF No. 82).

to IS-14, there would be little capacity left on the IS-14 satellite. *See id.* ¶ 54. Juch-Tech also alleges that Intelsat provided Juch-Tech with a financial analysis of the contracts to be assigned under the Transition Agreement, showing that the revenues from the contracts would exceed the cost of Juch-Tech's lease, resulting in a profit for Juch-Tech. *See id.* ¶ 56.

But Juch-Tech maintains that not everything was as it seemed. According to the allegations in Juch-Tech's amended counterclaim, Intelsat knew, but failed to disclose, that certain customers were not paying their bills and would not renew their contracts, that other customers had been complaining about poor service on the Linkstar Hub and IS-1R for some time, and that still others were threatening to terminate their contracts altogether. *See id.* ¶ 59. Juch-Tech, moreover, alleges that after the Transition Agreement was executed, Intelsat failed to conduct the transition from IS-1R to IS-14 in a manner that minimized the disruption of service and failed to correct other technical problems that made it difficult for Juch-Tech to serve existing clients and obtain new customers. *See id.* ¶¶ 33, 42.

Juch-Tech then fell behind on its payments to Intelsat. *See id.* ¶ 34. The companies entered a period of renegotiation between July and September of 2010, but Juch-Tech alleges that during this period, Intelsat approached current and potential Juch-Tech customers in order to convince them to abandon Juch-Tech and sign with Intelsat or another provider. *See id.* ¶¶ 35-36. Juch-Tech alleges that some of the statements Intelsat made to these clients about Juch-Tech were false and defamatory. *See id.* ¶ 47. The parties agree that their contractual relationship was terminated in October 2010. *See* 1st Am. Compl. ¶ 8; Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 8.

## B. Claims, Counterclaims, And Motions To Dismiss

Intelsat initiated litigation against Juch-Tech by filing a complaint for breach of contract and unjust enrichment on the theory that Intelsat performed all of its contractual obligations but Juch-Tech refused to pay for the services rendered. *See generally* 1st Am. Compl. Juch-Tech filed its original counterclaim alleging eleven causes of action, ranging from breach of contract under New York law to various torts under D.C. law to unfair competition under Canadian trademark law. *See generally* Answer 1st Am. Compl. & Countercls., ECF No. 10. After the Court granted in part and denied in part Intelsat's motion to dismiss Juch-Tech's original counterclaim, *see generally Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101 (D.D.C. 2013) (ECF No. 22), Juch-Tech, through new counsel, filed an amended counterclaim that included seven counts, many of which were identical or nearly identical to those in the original counterclaim: (1) breach of contract under New York law; (2) breach of the implied covenant of good faith and fair dealing under New York law; (3) fraud in the inducement under D.C. law; (4) tortious interference with contractual relations under D.C. law; (5) tortious interference with business relations under D.C. law; (6) defamation under D.C. law; and (7) unfair competition under the Canadian Trademark Act. *See generally* Am. Answer 1st Am. Compl. & Am. Countercls. By consent of the parties, Counts IV through VII have been dismissed. *See* Stip., ECF No. 42 (Counts VI and VII); Min. Order, Dec. 13, 2013 (Counts IV and V).

Intelsat filed a renewed motion to dismiss the remaining counts in the amended counterclaim, which the Court granted in part and denied in part. *See generally Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, No. CV 10-2095 (RC), 2014 WL 905323 (D.D.C. Mar. 10, 2014) (ECF No. 82). Specifically, the Court dismissed Juch-Tech's breach of contract claim as to its

4

"assignment of customers" theory and Juch-Tech's claim for breach of the implied covenant of good faith and fair dealing as it related to Intelsat's alleged misrepresentations about the condition of the assigned contracts. The Court denied the remainder of Intelsat's motion.

### C. Intelsat's Motion For Rule 11 Sanctions

Now before the Court is Intelsat's motion for Rule 11 sanctions against Juch-Tech, its counsel, and its counsel's law firm. *See generally* Pl.'s Mot. Sanctions, ECF No. 44. Intelsat asserts that Juch-Tech's original counterclaim included several tort counts and related allegations that were blatantly false and devoid of factual support.[2] *See* Pl.'s Mem. Supp. Mot. Sanctions 2-3, ECF No. 45. In May 2013, substitute counsel appeared on behalf of Juch-Tech and requested an extension of time to file an amended counterclaim. *See id.* at 4. Counsel for Intelsat responded with a letter to Juch-Tech's new counsel, Mark Shaffer, suggesting a longer extension of time so that he could fully investigate Juch-Tech's counterclaim allegations before refiling; Intelsat's counsel also warned attorney Shaffer that many of Juch-Tech's allegations, including the original fraud, tortious interference, and defamation claims, were frivolous, not supported by facts, and should be withdrawn. *See id.* at 4; *id.* Ex E (May 16, 2013 Letter from Bledsoe to Shaffer).

On May 28, 2013, Juch-Tech filed an amended counterclaim that left intact most of the original counterclaim's allegations that Intelsat made misrepresentations about the profitability of the customer contracts it was assigning to Juch-Tech, tortiously interfered with Juch-Tech's customers, and made defamatory statements about Juch-Tech. *See generally* Am. Answer 1st Am. Compl. & Am. Countercls. Intelsat now argues through its Rule 11 motion that a

---

[2] Because Juch-Tech's first counsel is unavailable to comment on his investigation before filing the original counterclaim, the Court finds that there is insufficient information available for evaluating whether Rule 11 was violated. The Court therefore will focus on Intelsat's arguments regarding the amended counterclaim.

5

reasonable pre-filing inquiry would have revealed that Juch-Tech lacked the facts necessary for establishing the essential elements of these claims. *See* Pl.'s Mem. Supp. Mot. Sanctions 18. Intelsat's specific arguments for sanctions are discussed below.

### III. ANALYSIS

#### A. Legal Standard For Rule 11 Sanctions

Under Federal Rule of Civil Procedure 11(b), the Court may impose sanctions if "a pleading, written motion, or other paper … [is] presented for any improper purpose[;]… the claims, defenses, and other legal contentions therein are [un]warranted by existing law[;]… the allegations and other factual contentions have [no] evidentiary support[; or] the denials of factual contentions are [un]warranted on the evidence[.]" *See* Fed. R. Civ. P. 11(b). The Court applies "an objective standard of reasonable inquiry on represented parties who sign papers or pleadings." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 554 (1991). Rule 11 is designed to insure that allegations made in a filing "are supported by a sufficient factual predicate at the time that the claims are asserted." *City of Yonkers v. Otis Elevator Co.*, 106 F.R.D. 524, 525 (S.D.N.Y. 1985). As such, it is "no answer to a motion seeking Rule 11 sanctions … to suggest that plaintiffs needed discovery to ascertain whether the claim asserted was well founded." *Id*.

The Court has "discretion to determine both whether a Rule 11 violation has occurred and what sanctions should be imposed if there has been a violation." *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002) (internal quotations omitted). Rule 11(c)(1) provides that if the Court determines Rule 11(b) was violated, it may impose sanctions on "any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "The sanction should be imposed on the persons — whether attorneys … or parties — who have violated the

rule or may be determined to be responsible for the violation." *Id*. Advisory Committee Note (1993) (subdivisions (b) and (c)); *see also Reynolds v. U.S. Capitol Police Board*, 357 F. Supp. 2d 19, 23-24 (D.D.C. 2004) ("Parties and their counsel may be sanctioned by the Court for violations of Rule 11."). Finally, the imposition of Rule 11 sanctions is not something courts take lightly; instead, Rule 11 sanctions are an extreme punishment for filing pleadings that frustrate judicial proceedings. *See Henok v. Chase Home Fin., LLC*, 926 F. Supp. 2d 100, 104 (D.D.C. 2013).

### B. Intelsat's Arguments For Sanctions

The critical question under Rule 11 is whether Juch-Tech undertook a reasonable investigation into the factual bases for its amended counterclaim *before* submitting the filing to the Court. *See Bus. Guides*, 498 U.S. at 554. In support of its motion, Intelsat sets forth several arguments about when and how Juch-Tech violated Rule 11 through its counterclaim theories and factual allegations that were not, and could not have been, based on a reasonable pre-filing inquiry.

First, Intelsat cites Juch-Tech's failure to provide written answers or documents to interrogatory requests for evidence supporting the counterclaims. Intelsat argues that these incomplete answers demonstrate that Juch-Tech never had a factual basis for making the allegations, yet it did so anyway. For example, in Interrogatory No. 7, Intelsat asked:

> Identify each actual or potential customer of Juch-Tech with whose contracts or business relations Intelsat interfered as alleged in the Counterclaims, and describe the specific acts, including the dates and participants in such acts, that constitute the wrongful interference.

Pl.'s Mem. Supp. Mot. Sanctions 6. Juch-Tech responded by referring Intelsat to its own communications with customers and stating that it could not provide more information at the time but would supplement the response later:

7

> Juch-Tech preliminarily refers Intelsat to all of its communications with [various customers]. As it has advised counsel for Intelsat, Juch-Tech cannot give a more complete, accurate, and professional answer to this Interrogatory until it completes its ongoing document review. Thereafter, Juch-Tech intends to utilize its option under Federal Rules of Civil Procedure Rule 33(d) to answer this Interrogatory.

*Id*. Juch-Tech provided a similar answer to several interrogatories targeting the evidentiary bases for its counterclaim allegations. Intelsat argues that although discovery remains ongoing, Juch-Tech's responses came two years into the litigation, which is highly suggestive that no such grounds ever existed to support Juch-Tech's allegations.

Second, Intelsat argues that Juch-Tech asserts a fraud claim that misrepresents indisputable facts to the Court. These misrepresentations come from Juch-Tech's claims premised on an email from Intelsat's Alicia Schwarcz to Juch-Tech on March 12, 2009, which included various attachments and information about customer contracts and billing. In the amended counterclaim, Juch-Tech alleges that Intelsat fraudulently represented that "leasing costs would be fully paid by Intelsat's … assignment to Juch-Tech of certain customer contracts, including the right of contract extensions and new contract negotiations" and "affirmatively represented that the customer contracts that it would assign to Juch-Tech generated a revenue stream … well in excess of the leasing fees for all the additional bandwidth and leave Juch-Tech with substantial bandwidth to lease to third parties at a profit." Am. Answer 1st Am. Compl. & Am. Countercls. ¶ 28; Pl.'s Mem. Supp. Mot. Sanctions, Ex. B.

In its motion for sanctions, Intelsat argues that Juch-Tech did not attach the Schwarcz email to the amended counterclaim because the email clearly demonstrates that Juch-Tech's fraud allegations are false. According to Intelsat, it made no guarantee, in this email or elsewhere, about future revenue or that the transaction would even be profitable for Juch-Tech. Rather, as Intelsat explains, the Schwarcz email "carefully and truthfully stated the termination

dates of the various contracts, five of which were month to month and could be terminated at any time." Pl.'s Mem. Supp. Mot. Sanctions 16. In addition, Intelsat points out that the Schwarcz email indicated to Juch-Tech that several of the assigned contracts were due to expire within six months, and thus any revenue flowing from those contracts would shortly cease if not extended or renewed. *See id.* Indeed, according to Intelsat, the chart attached to the Schwarcz email showed that one of the most profitable contracts was not being assigned to Juch-Tech, and as such, even if every contract Intelsat assigned to Juch-Tech was renewed or extended at the end of its term, Juch-Tech still would lose more than $35,000 per month by December 2009 unless Juch-Tech found additional customers on its own. *See id.* at 17. The Schwarcz email therefore did not make a promise about profitability to Juch-Tech; rather, Juch-Tech was provided with accurate information about the contracts and warned that it needed to investigate them for itself to determine their future status. *See id.* Despite these obvious facts, Intelsat argues, Juch-Tech maintained fraud allegations in its amended counterclaim.

Third, Intelsat argues in its motion for sanctions that Juch-Tech's tortious interference allegations violated Rule 11. *See id.* at 20. In the amended counterclaim, Juch-Tech asserts through multiple paragraphs that Intelsat intentionally made false or misleading statements to customers in order to harm Juch-Tech. For example, Juch-Tech alleges:

> Upon information and belief, Intelsat intentionally interfered with Juch-Tech's contracts with its customers by (a) inducing Juch-Tech's customers to breach their contracts by failing to pay Juch-Tech under their enforceable agreement; (b) entering into agreements with Intelsat for bandwidth Juch-Tech was providing on IS-1R; or (c) materially impairing or making impossible Juch- Tech's ability to serve its existing clients under their contracts by disparaging Juch-Tech's business capabilities and degrading the service Intelsat provided to Juch-Tech, which caused Juch-Tech's customers to decline to continue or renew their existing contracts.
>
> …

> Intelsat made false and misleading statements regarding Juch-Tech's financial status and Juch-Tech's relationship with Intelsat and degraded Intelsat service to Juch-Tech which in turn degraded the service Juch-Tech was able to provide its customers IS-1R and IS-14. By doing so, Intelsat caused existing Juch-Tech customers to decline to extend existing contracts and/or ratify terms for new contracts. Intelsat further prevented Juch-Tech from marketing its services to and/or beginning business relationships with new customers.

Am. Answer 1st Am. Compl. & Am. Countercls. ¶¶ 69, 72. Juch-Tech further alleges that "Intelsat's motive for interfering with Juch-Tech's business relationships was solely malicious," *id*. ¶ 74, and "Juch-Tech would have been able to renew its existing customer relationships and acquire additional customers but for Intelsat's wrongful conduct," *id.* ¶ 73.

During discovery, Intelsat asked Juch-Tech through multiple interrogatories to (1) identify actual or potential customers with whom Intelsat interfered; (2) identify facts or documents supporting allegations that Intelsat induced customers to breach contracts or not extend contracts with Juch-Tech; (3) describe the actions Intelsat allegedly took to commit the interference; and (4) identify facts or documents showing that Intelsat acted with a malicious motive. *See* Pl.'s Mem. Supp. Mot. Sanctions 22. Juch-Tech, however, was unable to provide any documents supporting these critical aspects of its tortious interference theory, which suggests that it lacked a pre-filing basis for the claim.

Similarly, Intelsat argues that Juch-Tech's defamation theory underlying the tortious interference counterclaim is without evidentiary support. Again, Juch-Tech failed to identify in response to discovery requests potential witnesses or documents showing the alleged defamatory or disparaging statements by Intelsat that could support Juch-Tech's allegations. *See id.* at 23. As Intelsat argues in its motion for Rule 11 sanctions, "Juch-Tech admits, under oath, it cannot identify a *single defamatory or disparaging statement* that Intelsat made; that despite its allegations of tortious interference, it cannot identify a *single customer* with whom Intelsat

tortiously interfered, or a *single act of tortious interference* that Intelsat committed." *Id.* at 14 (emphasis in original).

### C. Juch-Tech's Response To Intelsat's Arguments

Juch-Tech's substitute counsel defends against Intelsat's arguments by asserting that he undertook a reasonable pre-filing inquiry before submitting the amended counterclaim. In particular, attorney Shaffer suggests that when preparing the new counterclaim, he relied on information from Juch-Tech's management and staff, as well as interviews of third parties, identifiable emails and documents within Juch-Tech's possession, and an ancillary lawsuit involving the performance of Intelsat's Linkstar Hub. *See* Def.'s Mem. Opp'n Mot. Sanctions 7, 10, ECF No. 50. He further argues that this inquiry revealed "supporting documents and sources" for the allegations in the amended counterclaim. *See id.* at 4. Juch-Tech's counsel, however, fails to provide any details about his pre-filing inquiry from which the Court might evaluate whether Rule 11 was violated. For instance, he states that he relied on Juch-Tech employees for information and reviewed documents, but he does not provide an affidavit with specific information about what these employees said and how those statements supported the various counterclaim allegations. *See id.* at 7-8.

In particular, Juch-Tech asserts that its pre-filing inquiry revealed actual and potential customers with whom Intelsat tortiously interfered. *See id.* at 19. But Juch-Tech does not provide information about who these customers are and what Intelsat said to them that might constitute tortious interference. Instead, Juch-Tech defends its counterclaim allegations by arguing that it is not asserting a defamation claim, but rather just that Intelsat made disparaging comments to customers about Juch-Tech. *See id.* at 20-21. This response is insufficient and misses the point.

Intelsat's argument about how Juch-Tech violated Rule 11 has nothing to do with whether Juch-Tech alleges defamation in the technical sense of the tort versus mere disparaging statements. Rather, regardless of the description, the essence of Juch-Tech's counterclaim theory was that Intelsat made false and intentionally misleading statements to influence certain customers, yet Juch-Tech continuously fails to provide evidence regarding the substance of those alleged statements and to whom they were made. Juch-Tech could not provide these specifics in response to multiple interrogatories, and it likewise failed to demonstrate through its memorandum in opposition to Intelsat's Rule 11 motion what, if anything, its pre-filing inquiry revealed about Intelsat's alleged statements to customers and the contracts with which Intelsat allegedly interfered. The Court is left to surmise that either Juch-Tech is playing "hide the ball" by failing to disclose information through discovery, or the factual support never existed and the allegations were made in violation of Rule 11.

In response to Intelsat's argument that Juch-Tech's fraud claims were filed without supporting evidence, Juch-Tech's counsel states that the allegations were warranted due to pre-filing interviews with Juch-Tech employees and his review of the Schwarcz emails on March 12 and 19, 2009. *See id.* at 14. Juch-Tech devotes much time in its opposition memorandum restating information contained in these emails, *see id.* at 16, but it does not explain what material facts were withheld by Intelsat or how those facts conflicted with the information set forth in the emails and attachments such that they constitute false representations or material omissions. And most importantly, Juch-Tech fails to address Intelsat's argument that the March 19 Schwarcz email shows that Juch-Tech would actually lose money in the near future unless it acquired new contracts because a large sum included in the billing chart was for an Intelsat customer not being assigned to Juch-Tech under the Transition Agreement and whose payments

would end within nine months at the latest. In fact, this document seems to make clear that most of the contracts actually being assigned were expiring soon or were month-to-month contracts such that the customer could cancel at any time, which strongly contradicts Juch-Tech's fraud theory about guaranteed future revenue streams. Yet Juch-Tech does not respond to this critical issue in its opposition memorandum.

### D. Further Information Is Required

The Court is troubled by Juch-Tech's failure to respond in detail to many of Intelsat's Rule 11 arguments such that the Court might assess whether a reasonable pre-filing inquiry was conducted before the amended counterclaim was filed. General assertions, unsupported by affidavits or other documentation, that Juch-Tech employees were interviewed and some documents were reviewed do not clarify the scope of the pre-filing inquiry, whether that inquiry actually revealed a sufficient evidentiary basis to support certain counterclaims and allegations, or whether Rule 11 was violated by Juch-Tech and its counsel. *See, e.g.*, *Kingvision Pay-Per-View Ltd. v. Ramierez*, No. 05 CIV.2778, 2005 WL 178511, at *3 (S.D.N.Y. July 28, 2005) ("[T]he failure to submit such an affidavit strongly suggests that no pre-filing inquiry was made and consequently that no evidentiary support exists." (citation, quotation, and internal alteration omitted)). The fact that Juch-Tech's discovery responses fail to reveal any evidence to support its claims only aids Intelsat's argument for sanctions. Indeed, counsel for Intelsat warned Juch-Tech's new counsel about the inaccuracies of the original counterclaim, but, based on the facts available to the Court, it appears that counsel failed to heed this warning before hastily refiling the counterclaim.

Nonetheless, the Court recognizes that it has discretion to determine if Rule 11 was violated and, if so, what sanctions are appropriate. *See Cobell v. Norton*, 211 F.R.D. 7, 10

(D.D.C. 2002). The Court therefore will give Juch-Tech another opportunity to defend against Rule 11 sanctions by submitting a detailed affidavit explaining *with specificity* its pre-filing inquiry, including who was interviewed and what information they provided in support of the counterclaim issues raised in Intelsat's motion for sanctions.[3] For example, the Court expects specific information regarding the disparaging statements Intelsat allegedly made to customers and how those statements constitute tortious interference. The Court also expects an explanation about the pre-filing factual support for the fraud and misrepresentation allegations based on the promised revenue stream theory given that: most of the contracts were set to expire soon or were month-to-month; Juch-Tech appears to mistakenly rely on the chart in the Schwarcz email which includes a valuable contract not actually being assigned by Intelsat; and Schwarcz warned Juch-Tech that it should investigate for itself the status of the contracts to clarify any discrepancies, which suggests Juch-Tech may not have been reasonable to rely on this email in the first place.

### IV. CONCLUSION

For the foregoing reasons, the Court defers ruling on Intelsat's motion for Rule 11 sanctions until it receives Juch-Tech's supplemental response, which shall be due within thirty days of issuance of this decision. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 2, 2014                                     RUDOLPH CONTRERAS
                                                        United States District Judge

---

[3] In a footnote to its opposition memorandum, Juch-Tech's counsel offers to provide further information about its investigation through a sealed affidavit for in-camera inspection only. *See* Def.'s Mem. Opp'n Mot. Sanctions 10 n.9. The Court recognizes Juch-Tech's concern about waiving the attorney-client and work-product privileges, so it will agree to an in-camera inspection of a sealed affidavit insofar as any statements contained therein are privileged and not subject to disclosure to Intelsat.